TRINITY BROADCASTING OF FLOR-
IDA, INC. and Trinity Christian Cen-
ter of Santa Ana, Inc., d/b/a Trinity
Broadcasting Network, Appellants,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

Colby May, National Minority
Television, Inc.,
Intervenors.

Nos. 99–1183, 99–1184 and 99–1186.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 29, 2000.

Decided May 5, 2000.

Timothy B. Dyk argued the cause for appellants and intervenors supporting appellants. With him on the briefs were Howard A. Topel, Kathryn R. Schmeltzer and Lawrence D. Rosenberg. Barry H. Gottfried entered an appearance.

William H. Crispin, Dean R. Brenner and Katherine Connor Linton were on the brief of amici curiae Members of Congress, Senator John Ashcroft and Congressman Randy Cunningham.

Jordan W. Lorence was on the brief of amici curiae Evangelical Association of Pastors & Layman, et al.

Joel Marcus, Attorney, Federal Communications Commission, argued the cause for appellee. With him on the brief were Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel. C. Grey Pash, Jr., Counsel, entered an appearance.

Before: EDWARDS, Chief Judge, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

This case presents a recurring question of administrative law: What constitutes sufficiently fair notice of an agency's interpretation of a regulation to justify punishing someone for violating it? The Federal Communications Commission interpreted its now-superseded minority preference regulation as requiring not only that a majority of an applicant's board of directors be minorities, but also that an applicant demonstrate actual control by minorities. Acting on this interpretation, the Commission denied appellants' application to renew a commercial television broadcast license as a sanction for their earlier claim to a minority preference based on a majority-minority board. Although we defer to the Commission's interpretation of its regulation as requiring actual minority control, we find that neither the regulation nor the Commission's related statements gave fair notice of that requirement. We therefore vacate the Commission's denial of appellants' license renewal application.

I

"Congress found that 'the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the media of mass communications.'" *Metro Broad., Inc. v. FCC,* 497 U.S. 547, 566, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (quoting H.R. CONF. REP. No. 97–765 at 43 (1982)), overruled on other grounds by *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In 1971, minorities owned not a single television station anywhere in the United States. *Id.* at 553, 110 S.Ct. 2997. Having found that "the viewing and listening public suffers when minorities are underrepresented among owners of television and radio stations," the Federal Communications Commission has undertaken various measures "to encourage minority participation in the broadcast industry." *Id.* at 554, 110 S.Ct. 2997. Congress also acted to promote minority ownership, directing the Commission to:

> establish rules and procedures to ensure that, in the administration of any system of random selection under this subsection used for granting licenses or construction permits for any media of mass communications, significant preferences will be granted [to certain applicants to increase diversification of ownership]. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group.

Pub.L. No. 97–259, § 115(c)(1), 96 Stat. 1087 (1982), (codified at 47 U.S.C. § 309(i)(3)(A)).

Responding to this directive, the Commission issued a regulation granting preferences to minority applicants in lotteries for low-power and translator television station licenses. 47 C.F.R. § 1.1622(b). Low-power and translator television stations operate "on UHF channels at much lower power than full service (convention-al) television stations." *Neighborhood TV Co., Inc. v. FCC,* 742 F.2d 629, 631 (D.C.Cir.1984). Section 1.1622(b) of the Commission's regulations granted lottery preferences to "[a]pplicants, more than 50% of whose ownership interests are held by members of minority groups." 47 C.F.R. § 1.1622(b)(1). In a statement explaining section 1.1622(b), the Commission provided several entity-specific definitions of this standard. With respect to "stock corporations," the Commission said: "If a majority of the voting shares are held by minorities, the corporation is entitled to a minority preference." *Public Notice,* Mimeo No. 6030 at 4 (released August 19, 1983). Of particular significance to this case, the Commission said that for "nonstock corporations" (for instance non-profit corporations), "[i]f a majority of the governing board ... are minorities, the entity is entitled to a minority preference." *Id. See also Random Selection Lotteries,* 93 F.C.C.2d 952, 977, 1983 WL 183081 (1983) ("We agree ... that nonstock corporations ... should be judged as to minority status on the basis of the composition of the board.").

Limited to lotteries for low-power/translator television station licenses, section 1.1622 did not address minority underrepresentation in the lucrative full-power, commercial television station market. A Commission advisory committee exploring the causes of underrepresentation in that market concluded that minority broadcasters faced serious shortages of capital. *See Strategies for Advancing Minority Ownership Opportunities in Telecommunications* 19 (May 1982). To address this problem, the committee suggested that the FCC encourage partnerships between minority entrepreneur broadcasters and established broadcasters. *Id.* at 24. The advisory committee warned, however, that the Commission's multiple ownership regulation—which limited the number of commercial broadcast licenses in which a particular entity could have an interest—posed a significant barrier to such part-

nerships. Because established broadcasters holding the maximum permissible number of licenses would be unable to have "interests" in additional licenses, minority entrepreneurs with whom they formed partnerships would be ineligible for television licenses. The advisory committee recommended that the Commission grant "waivers or expansion of multiple ownership and diversification requirements to established entrepreneurs who participate in telecommunications ventures with minorities.... For example, FCC policies should allow an established entrepreneur to acquire an equity interest in a minority-controlled property that otherwise would exceed multiple ownership limits...." *Id.* at 32.

In 1985, the Commission took a step toward facilitating the partnerships the advisory committee had recommended. It granted an exception to the multiple ownership limits for "minority-controlled" broadcast stations. As amended, the regulation stated:

> No license for a ... TV broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors, directly or indirectly, owning, operating or controlling, or having a cognizable interest in, either:
>> (i) more than fourteen (14) stations in the same service, or
>> (ii) more than twelve (12) stations in the same service which are not minority-controlled.

47 C.F.R. § 73.3555(d)(1) (1990). In other words, section 73.3555 essentially limited broadcasters to having interests in twelve licenses, except that they could have interests in two additional licenses for "minority-controlled" stations. In language central to this case, section 73.3555 continued: " '[M]inority-controlled' means more than 50 percent owned by one or more members of a minority group." *Id.*

§ 73.3555(d)(3)(iii). Although section 73.3555 provided no further definition of "minority-controlled," it concluded with this note: "The word 'control' as used herein is not limited to majority stock ownership, but includes actual working control in whatever manner exercised." *Id.* § 73.3555 note 1.

Congress has since eliminated the multiple ownership limits. *See* Telecommunications Act of 1996, Pub.L. No. 104–104, § 202(c)(1)(A), 110 Stat. 56. But because the events leading up to this case occurred during the period section 73.3555 was in effect, that section controls the disposition of this case, as all parties agree.

Created by Dr. Paul Crouch in 1973, appellant Trinity Christian Center of Santa Ana, Inc., d/b/a Trinity Broadcasting Network ("TBN"), is a non-profit "electronic evangelical ministry." Crouch serves as TBN's President. TBN produces its own religious programming, which it uses as the core of its twenty-four-hour broadcast. Its broadcasts also include religious programs produced by other ministries—"a wide variety of Protestant and Episcopalian denominations, as well as Catholic, Seventh Day Adventist, and Messianic Jewish programs." Reaching viewers throughout the country, TBN's programming is broadcast on TBN's own commercial and translator television stations and on stations operated by smaller non-profit corporations like appellant Trinity Broadcasting Florida, Inc. ("TBF"), which Crouch created to carry TBN programming.

Pearl Jane Duff, an African American minister, started as a volunteer at TBN but was quickly hired as a salaried employee. She became Crouch's assistant in 1981 and has worked at TBN in that capacity ever since. Shortly after Duff began working for TBN, she was appointed to the boards of TBN and TBF. She remained on those boards until resigning in the summer of 1984.

In 1980, Crouch formed Translator TV, Inc. ("TTI"), predecessor to intervenor National Minority Television, Inc., a non-profit, non-stock religious broadcast corporation. Crouch explained his creation of TTI as follows: In a conversation with Richard Wiley, former Chairman of the FCC, Wiley "impressed upon me very strongly that the emerging policy of the FCC was to foster the integration of minorities into broadcasting. He encouraged me to ... begin thinking of directions that TBN could take as our network grew to assist in the implementation of this emerging policy." According to Crouch, he "conceived of the idea to organize a new company that would integrate minorities into broadcasting and further promote the emerging policy Mr. Wiley spoke to me about.... I felt that TTI would both help to implement the FCC's minority ownership policy and hopefully allow TBN to develop, as new affiliates, stations that TTI might acquire." Two of TTI's three board members were minorities: Duff served as Vice President and Secretary, and Phillip Espinoza, an Hispanic pastor, served as Chief Financial Officer. Crouch, a non-minority and President of TTI, served as the third board member.

Focusing on the translator television market, TTI filed seventeen applications for FCC permits to construct translator television stations to rebroadcast TBN programming. The Commission, however, had frozen all new translator television applications, so it took no action on TTI's. When the Commission promulgated section 1.1622(b)(1)'s minority preference for translator television licenses, TTI amended its pending applications and filed certifications with the FCC claiming entitlement to minority preferences based on its majority-minority board. Because translator television station license applications were still frozen, the Commission had no occasion to assess TTI's eligibility for a minority preference. TTI held no other licenses and conducted very little business while waiting for the Commission to act on its applications, functioning for all intents and purposes as a part of TBN: TTI maintained no separate bank account, it had no accountant or lawyer of its own, and its board conducted its annual meetings jointly with TBN's affiliates.

Meanwhile, the Commission had promulgated section 73.3555, the minority exception to the high-power multiple ownership limit. At that time, Crouch and TBN held licenses for twelve high-power stations. TBN's counsel, intervenor *Colby May*, advised Crouch that TBN could acquire interests in two additional stations as long as those stations were "minority-controlled." May testified that he thought TTI was minority-controlled because a majority of its board members were minorities, and he so advised Crouch.

Deciding to broaden its focus from translator television to commercial television, TTI changed its name to National Minority Television, Inc. ("NMTV") and applied for a license for a commercial high-power station in Odessa, Texas. NMTV was the first minority broadcaster to claim section 73.3555's minority exception to the multiple ownership limit. In an attachment to its Odessa application entitled "Broadcast Interests and Statement of Compliance with Rule 73.3555(d)," NMTV asserted that issuing it the license was consistent with the multiple ownership regulation: "[W]hile one of NMTV's principals, Paul F. Crouch, presently has an interest in 12 commercial television facilities ... a majority of its directors are minorities, and NMTV is therefore minority controlled and in compliance with rule 73.3555(d)(1)." The application did not mention that NMTV board member Duff was employed by TBN, or that she had previously served on TBN's board.

An attorney in the Commission's Mass Media Bureau assigned to review NMTV's application contacted May, asking for more detail about NMTV. May explained that Trinity would provide NMTV's financing and programming and that Duff worked for Trinity. "Concerned" about the over-

lap between Trinity and NMTV, the Commission attorney went to his supervisor, who asked May for NMTV's bylaws. May testified that the supervisor "was interested in determining that NMTV's affairs were governed by the majority vote of its directors, and that unanimous votes were not required." After May provided the requested information, the Mass Media Bureau and ultimately the Commission approved the application.

Having obtained the Odessa license and acting on May's advice, NMTV began observing more of the formalities of a corporate entity. *See Trinity Broad. of Florida, Inc.,* 14 F.C.C.R. 13570, 13591 ¶ 56, 1999 WL 216003 (1999) ("*Trinity*"). It opened its own bank accounts, began paying TBN for accounting and legal services, and conducted regular board meetings. *Id.* at 13591 ¶ ¶ 56–57. NMTV also applied for a second license, this one for a station in Portland, Oregon. Like the Odessa application, the Portland application asserted that granting NMTV the license would not violate the multiple ownership regulation because NMTV was minority-controlled. Again, the Commission approved the application. The Portland and Odessa licenses gave Crouch interests in fourteen stations, the limit under the multiple ownership rules.

Shortly after acquiring the Portland license, NMTV sold the Odessa license, freeing it to purchase another station, which it attempted to do by bidding on a license for a bankrupt Wilmington, Delaware station. In its application to the FCC for approval of the Wilmington purchase, NMTV asserted, as it had in the Odessa and Portland applications, that approving its license acquisition would not violate the multiple ownership limits because, since minorities constituted a majority of its board, it was minority-controlled. A petition filed by a challenger to NMTV's application asserted that Crouch and TBN (not a minority-controlled corporation) actually controlled NMTV and that Crouch had therefore violated the multiple ownership regulation by having interests in more than twelve stations, none of which was minority controlled. Before the FCC could resolve the question of NMTV's minority status, NMTV withdrew its application because its authorization from the Delaware bankruptcy court to purchase the license had expired.

The question of NMTV's minority status arose again, this time in the proceedings that led to the Commission's denial of the commercial television license renewal at issue in this case. When TBN's Florida affiliate, TBF, filed an application to renew its license for WHFT, Channel 45, a commercial television station in Miami, a competitor for the license asserted, as had the party opposing the Delaware license, that Crouch had violated the multiple ownership regulation by exerting control over NMTV. The Commission issued a Hearing Designation Order, instructing an Administrative Law Judge to determine, among other things, whether Crouch and TBN "exercised *de facto* control over" NMTV, whether Crouch and TBN abused the FCC's processes "by using NMTV to evade the provisions" of the multiple ownership regulation, and whether TBF "is qualified to remain a Commission licensee" in light of any evidence adduced on the preceding two questions. *Hearing Designation Order,* 8 F.C.C.R. 2475, 2481 ¶ 48, 1993 WL 756184 (1993).

Examining Crouch's and TBN's conduct from 1987 to 1991 (the period during which TBF held the Miami license), the ALJ concluded that TBN and Crouch exercised *de facto* control over NMTV and that NMTV was therefore not "minority-controlled." *Trinity Broad. of Fla., Inc., Initial Decision of Administrative Law Judge,* 10 F.C.C.R. 12020, 1995 WL 646333 (1995). The ALJ also ruled that "NMTV, Crouch and TBN abused the Commission's processes" not only by creating NMTV as a "sham corporation" to evade the multiple ownership regulation, but also by repeatedly concealing material facts from the

Commission that would have demonstrated that TBN controlled NMTV—primarily Duff's employment relationship with TBN and the extensive interrelationship between TBN and NMTV. *Id.* at 12061 ¶¶ 329–30 & n. 47. The ALJ concluded that Crouch's conduct in connection with TTI and TTI's representations in its low power applications also supported an abuse of process finding. *Id.* at 12060 ¶¶ 325–26. The Commission's Mass Media Bureau Trial Staff thought section 73.3555's actual control requirement insufficiently clear to justify denying TBF's license, but the ALJ disagreed, finding that because of TBN's and Crouch's "willful" and "egregious" misconduct, TBF was unqualified to hold the Miami license. *Id.* at 12062 ¶¶ 331, 333.

By a three to two vote, the Commission upheld the ALJ's abuse of process determination with respect to NMTV's high-power Odessa and Portland television station applications. *Trinity,* 14 F.C.C.R. 13570. Ruling that section 73.3555 required *de facto* minority control, the Commission found that TBN, not NMTV's minority board, actually controlled NMTV. "Commission rules and precedent have always given fair notice that de facto control is required to take advantage of the special provision concerning minority ownership in the multiple ownership rules." *Id.* at 13602 ¶ 86. "[T]he principals knew," the Commission concluded, "that, because of the relationship between NMTV and TBN, their claim of minority control was at best doubtful and at worst false." *Id.* at 13601 ¶ 83. This "serious abuse of process with respect to NMTV's full power applications" warranted denying TBF's license renewal application. *Id.* at 13601 ¶ 85, 13610 ¶¶ 100–01. In view of that conclusion, the Commission addressed only briefly the ALJ's abuse of process determination with respect to the low-power/translator television license applications, reversing the ALJ because "applicants may well have been confused ... that the exercise of de facto control by nonminorities subverted the purposes of

the minority ownership policy...." *Id.* at 13601 ¶ 85. Dissenting from the highpower abuse of process determination and the denial of TBF's renewal application, two commissioners disagreed with the majority that section 73.3555 provided fair notice: "[Section 73.3555] certainly did not make clear that a *de facto* control showing was necessary...." *Id.* at 13632 (Commissioners Furchgott–Roth and Powell, dissenting in part). "In these circumstances," they said, "we find that imposition of the 'death penalty' of disqualification is both unfair and unwarranted." *Id.* at 13634.

Appellants TBN and TBF, joined by intervenors NMTV and Colby May (throughout this opinion, we shall refer to these appellants and intervenors as "Trinity"), challenge both the Commission's determination that TBN and Crouch abused Commission processes when NMTV filed high-power applications asserting that it was "minority-controlled," and the Commission's denial of TBF's renewal application. Trinity does not challenge the Commission's finding that TBN exercised *de facto* control over NMTV. Instead, it contends that TBN's exercise of *de facto* control did not justify denying TBF's license renewal. In support of this claim, Trinity makes several arguments, only two of which require our attention: (1) the Commission's interpretation of section 73.3555 as requiring *de facto* minority control is unreasonable; and (2) even if the Commission's interpretation is reasonable, the regulation failed to provide fair notice that *de facto* minority control was required. We consider each argument in turn.

## II

Trinity argues that section 73.3555 requires only that a majority of a non-profit entity's board members be minorities. According to Trinity, the regulation does not require that the minority board members exercise "actual," *i.e., de facto,* control over the entity. Acknowledging our traditional

deference to an agency's interpretation of its own regulations, Trinity contends that no deference is warranted in this case because the Commission's interpretation of section 73.3555 as requiring *de facto* minority control conflicts with the regulation's plain language. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (holding that agency's interpretation may not be entitled to deference if an alternative interpretation "is compelled by the regulation's plain language") (internal quotation marks omitted). Trinity relies on the fact that section 73.3555's only definition of "minority controlled"—"more than 50 percent owned by one or more members of a minority group," 47 C.F.R. § 73.3555(d)(3)(iii) (1990)—says nothing about *de facto* control.

As the Commission points out, however, its *de facto* control requirement derives directly from the term being defined, *i.e.,* "minority-*controlled.*" As the Commission also points out, the definition of "minority-controlled" does not even apply to Trinity, for it speaks only in terms of "ownership," a concept having no meaning with respect to non-profit entities. For these reasons, we agree with the Commission that no conflict exists between section 73.3555's plain language and the Commission's ruling that majority-minority boards of directors of non-profit entities must exercise *de facto* control.

▆▆▆ The question, then, is this: Does the Commission's interpretation "sensibly conform" to both the purpose and the text of the regulation? *Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.,* 194 F.3d 125, 128 (D.C.Cir.1999) (internal quotation marks omitted). In answering this question, we "accord [the Commission's] interpretation of its own regulations a high level of deference, accepting it unless it is plainly wrong." *General Elec. Co. v. EPA,* 53 F.3d 1324, 1327 (D.C.Cir.1995) (internal citations and quotation marks omitted). "Our task is not to decide which among several competing interpretations best

serves the regulatory purpose;" rather, "we must defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381 (internal quotation marks omitted). "[E]ven where the petitioner advances a more plausible reading of the regulations than that offered by the agency, it is the agency's choice that receives substantial deference." *GE,* 53 F.3d at 1327 (internal quotation marks omitted). Applying this exceedingly deferential standard of review, we conclude that the Commission's requirement that majority-minority boards of non-profit entities exercise *de facto* control represents a reasonable interpretation of section 73.3555.

We begin with the concept of "minority-controlled." As the Commission points out, interpreting section 73.3555 as not requiring *de facto* minority control would not only read the word "controlled" out of the regulation, but run counter to the Commission's "longstanding focus on control" and real parties in interest. The Commission put it this way in its brief: "The agency has consistently looked beyond the ownership structure of licensees to determine who is the 'real party in interest'—whether a person 'is or will be in a position to actually or potentially control the operation of the station.'" Trinity's interpretation, moreover, would undermine the regulation's purpose. "[I]t is hard to imagine," the Commission reasoned, "how an entity controlled by minorities in name only or in which the minorities' interests are totally passive could foster the objective of the Commission's policies to broaden minority voices and spheres of influence over the airwaves." *Trinity,* 14 F.C.C.R. at 13602 ¶ 87 (internal quotation marks omitted). According to the Commission, interpreting the regulation to require only a majority-minority board "would provide an incentive for non-minorities to hire front-men." The Commission's position

has intuitive logic: How could an entity actually controlled by non-minorities be "minority-controlled?"

In support of its interpretation of section 73.3555 as requiring that non-stock corporations demonstrate actual minority control, the Commission points to two additional authorities: (1) Note 1 of section 73.3555, which provides that "[t]he word 'control' as used herein is not limited to majority stock ownership, but includes actual working control in whatever manner exercised," and (2) a footnote to the Commission's 1985 Order adopting section 73.3555's minority exception, *see Amendment of Section 73.3555*, 100 F.C.C.2d 74, 95 n. 59, 1985 WL 260060 (1985), which cites a 1982 Policy Statement saying that preferential treatment in the form of tax certificates would be granted " 'where minority ownership is in excess of 50% *or* controlling. Whether certificates would be granted in *other* cases will depend on whether minority involvement is significant enough to justify the certificate in light of the purpose of the policy announced herein.' " *Trinity*, 14 F.C.C.R. at 13603 ¶ 88 (*quoting Minority Ownership in Broad.*, 92 F.C.C.2d 849, 853 ¶ 7, 1982 WL 190435 (1982)) (emphasis added). Both statements define control in terms of either majority stock ownership or actual control. Because non-profits like Trinity, having no stockholders, are unable to demonstrate "majority stock ownership," we think it not unreasonable for the Commission to read Note 1 and the 1982 Policy Statement to require nonprofits to show actual control by minorities.

Relying on *Southwest Texas Public Broadcasting Council*, 85 F.C.C.2d 713, 715, 1981 WL 158610 (1981), the Commission also contends that it has "long-standing precedent, applicable to non-stock corporations such as NMTV, that 'control' encompasses every form of actual or legal control over basic operating policies." *Trinity*, 14 F.C.C.R. at 13602 ¶ 86. In *Southwest Texas*, the agency "looked beyond legal title" at who *actually* controlled the operation of a station licensed to a non-profit entity in order to determine whether the non-profit had illegally transferred control of the station. 85 F.C.C.2d at 715. Although *Southwest Texas* involved a provision of the Communications Act not at issue here, the case supports the general argument that the Commission goes beyond legal formalities—legal title in that case and boards of directors here—to determine control.

Urging us not to defer to the Commission's interpretation of section 73.3555, Trinity argues that requiring *de facto* minority control conflicts with prior Commission statements. It points first to the Commission's statement that "[i]n a non-stock corporation the Commission *normally* looks to directors in evaluating ownership and control." *Hearing Designation Order*, 8 F.C.C.R. at 2475 ¶ 4 n. 1 (*citing Roanoke Christian Broad., Inc.*, 52 R.R.2d 1725, 1983 WL 182821 (1983)) (emphasis added). The Commission has a persuasive response: Looking first to the board of directors as one indicator of control is not at all inconsistent with its interpretation of section 73.3555 as requiring that majority-minority boards *actually control* non-profit corporations.

Trinity next points to the Commission's statement in connection with section 1.1622 (the low-power regulation) that "[i]f a majority of the governing board ... are minorities, the entity is entitled to a minority preference." *Public Notice*, Mimeo No. 6030 at 4 (released August 19, 1983). This statement, Trinity argues, forecloses the Commission from interpreting section 73.3555 as requiring *de facto* minority control. We disagree. The statement was made in connection with the Commission's regulation governing minority preferences in the *low-power* market, and until this proceeding the Commission had never addressed how section 73.3555 applies to non-stock corporations. As the Commission itself said when it promulgated section 73.3555, it "has adopted different standards of minority control depending on the

mechanism used to foster its minority policies." *Amendment of Section 73.3555*, 100 F.C.C.2d at 95 ¶ 46.

We are equally unpersuaded by Trinity's contention that the Commission's interpretation of section 73.3555 conflicts with the agency's position before the Supreme Court in *Metro Broadcasting*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445, where the Commission defended the intrinsic value of minority ownership. Not only does Trinity's argument rely on an incorrect assumption—that the Commission's previous recognition of minority ownership's value bars it from taking a different position when interpreting a different regulation—but the Commission's interpretation here is not necessarily inconsistent with its prior emphasis on ownership. Because this case involves the definition of "controlled" in the context of non-profits for which the concept of "ownership" has no meaning, the Commission's prior emphasis on ownership casts no doubt on its interpretation of section 73.3555.

Trinity next argues that the Commission's definition of "minority-controlled" undermines section 73.3555's purpose. Acknowledging that section 73.3555 was designed to encourage established broadcasters to provide support to minority broadcasters, Trinity says that "a *de facto* control standard could lead to exceedingly difficult interpretive questions. A bright line 'ownership' standard [is] more workable than a more nebulous 'ownership' and *de facto* control standard.... [Bright-line] rules prevent 'controversy and confusion,' thereby 'encourag[ing] settled expectations and, in doing so, foster[ing] investment by businesses and individuals.' "

■ Perhaps Trinity is correct. Perhaps requiring *de facto* minority control will discourage established broadcasters, or at least non-profit established broadcasters, from providing the kinds of assistance that the Commission had hoped section 73.3555 would foster and that Trinity made available to NMTV. A challenge to

an agency's interpretation of its own regulation, however, turns not on whether the *challenger* has articulated a rationale to support its interpretation, but on whether the *agency* has offered an explanation that is reasonable and consistent with the regulation's language and history. *See GE*, 53 F.3d at 1327. In this case, we have no doubt that the Commission's desire to promote true minority control and to prevent sham arrangements is sufficient to justify its interpretation of section 73.3555 as requiring *de facto* minority control.

Finally, Trinity observes that, in a dissent from the Commission's Order adopting section 73.3555, Commissioner Patrick interpreted the regulation as not requiring *de facto* minority control: "Under the majority's scheme, the right to purchase broadcast stations over the established ceiling turns upon the race of the proposed owners alone. No further showing is required with respect to how these new owners may contribute to diversity. No concern is given as to whether the 51% minority owners will exert any influence on the station's programming or will have any control at all." *Amendment of Section 73.3555*, 100 F.C.C.2d at 104 (Commissioner Patrick dissenting in part). Because the majority adopting section 73.3555 neither responded to this concern nor offered a contrary interpretation, Trinity argues that the Commission may not now interpret section 73.3555 to give any "concern" to whether the minority owners "will have any control at all." In the decision on appeal in this case, however, the Commission interpreted section 73.3555 as requiring *de facto* minority control, and it is to that decision, not to the earlier dissent, that we owe deference.

To sum up, requiring *de facto* minority control of non-profit corporations represents a reasonable interpretation of section 73.3555. Although Trinity offers a plausible alternative interpretation, we cannot say, in view of the regulation's language and underlying policy, that the Commission's interpretation is "plainly wrong."

## III

■ Were we simply reviewing the Commission's interpretation of its regulation, our task would be at an end. But the Commission has not just interpreted section 73.3555. Concluding that Trinity had abused Commission processes by exercising *de facto* control over NMTV in violation of section 73.3555, the Commission imposed a severe penalty—denial of Trinity's application to renew its commercial television station license. Because "[d]ue process requires that parties receive fair notice before being deprived of property," we have repeatedly held that "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *GE*, 53 F.3d at 1328–29. We thus ask whether "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform...." *Id.* at 1329 (internal quotation marks omitted).

In *Satellite Broadcasting Co., Inc. v. FCC*, 824 F.2d 1 (D.C.Cir.1987), for example, the Commission had dismissed as untimely applications to operate radio stations, finding that the applications had been filed in the wrong location. Because the rules addressed the filing of applications "in a baffling and inconsistent fashion," we held that the FCC had failed to give fair notice of its interpretation and thus could not "use that interpretation to cut off a party's right." *Id.* at 2, 4. In *GE*, EPA had fined General Electric for distilling used solvents and incinerating only the contaminated portion instead of immediately incinerating the entire solution. 53 F.3d at 1326–27. Although we deferred to EPA's interpretation of its regulations as requiring immediate incineration of the entire solution, we held that the agency could not fine GE for its failure

to comply with an interpretation that was "so far from a reasonable person's understanding of the regulations that [the regulations] could not have fairly informed GE of the agency's perspective." *Id.* at 1330. *See also, e.g., United States v. Chrysler Corp.*, 158 F.3d 1350, 1354–57 (D.C.Cir. 1998) (holding that agency failed to provide fair notice of specific requirements of compliance testing and government therefore could not seek an automobile recall on the ground that Chrysler had failed properly to perform the testing); *Rollins Envtl. Svcs. (NJ) Inc. v. EPA*, 937 F.2d 649, 653 (D.C.Cir.1991) (rescinding fine assessed by EPA because regulation was ambiguous); *Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154, 156 (D.C.Cir.1986) (holding that agency failed to give fair notice of its interpretation that breathing equipment was required where the regulation "would reasonably be read" not to require the equipment).

■ Conceding that the denial of a broadcast license triggers due process protection, the Commission argues that section 73.3555 gave fair notice that nonprofit entities had to demonstrate *de facto* minority control. Trinity disagrees. Not only did section 73.3555 itself fail to make clear that non-profits had to show anything other than a majority-minority board, Trinity argues, but Commission statements in connection with the low-power minority preference regulation, together with Commission action on Trinity's high-power applications, led it to believe that a majority-minority board was sufficient.

We begin again with section 73.3555's requirement that an entity be "minority-controlled." This time we ask not whether interpreting the term "minority-controlled" as requiring *de facto* minority control in the non-profit context is "plainly wrong," but whether that interpretation is "ascertainably certain." Although section 73.3555 never defines "minority controlled" in the context of non-profit organizations, the Commission maintains that section

73.3555's use of the word "controlled" should have made clear to Trinity that the agency was interested in actual control. Under the circumstances of this case, we disagree.

To begin with, the Commission never clearly articulates its theory of where or how section 73.3555 requires "actual minority control." At various points in both its decision and in its brief here, the Commission appears to contend that the term "minority-controlled" requires an entity to show that minorities have *either* majority stock ownership *or* actual control; since non-profits lack stock owners and cannot show that they are "more than 50 percent owned by one or more members of a minority group," they must demonstrate actual minority control. *See, e.g.,* 14 F.C.C.R. at 13603–04 ¶ 88 ("[W]hat the Commission had in mind was 50 percent ownership that constitutes voting control or an equivalent degree of interest."). Elsewhere, however, the Commission seems to agree with Trinity that "stock ownership" means board membership in the non-profit context. Viewed this way, the actual control requirement stems from the word "ownership"—entities must demonstrate not only that minorities own more than fifty percent of the stock or that they have majority-minority boards, but also that those "ownership" interests are *bona fide. Id.* at 13604 ¶ 90 ("[T]he Commission has consistently required that minorities have both a substantial equity interest and actual control of the station."). In other words, both non-profits and stock corporations would have to show *de facto* minority control. As we said of a similar situation in *GE,* "[s]uch confusion does not inspire confidence in the clarity of the regulatory scheme." 53 F.3d at 1332.

The Commission argues that "[a] reasonable reader could have ascertained that a regulation requiring 'minority control' by implication forbade control by non-minorities." This argument might have some force but for the fact that the Commission's only clear statements (until it re-fused to renew Trinity's Florida license) about what constituted minority control over "non-stock corporations" like Trinity were these: "If a majority of the governing board . . . are minorities, the entity is entitled to a minority preference," *Public Notice,* Mimeo No. 6030 at 4 (released August 19, 1983); and "[w]e agree . . . that nonstock corporations . . . should be judged as to minority status on the basis of the composition of the board." *Random Selection Lotteries,* 93 F.C.C.2d at 977. To be sure, the Commission made these statements in connection with section 1.1622, the low-power minority preference rule, but section 1.1622's language is virtually identical to section 73.3555's: the former granted minority preferences to "[a]pplicants, more than 50% of whose ownership interests are held by members of minority groups," 47 C.F.R. § 1.1622(b)(1); the latter granted preferences to entities "more than 50 percent owned by one or more members of a minority group." 47 C.F.R. § 73.3555(d)(3)(iii) (1990). Applicants could thus have assumed, quite reasonably we think, that section 1.1622's statements regarding non-stock corporations applied equally to section 73.3555. And just as those statements "may well have . . . confused" low-power applicants, as the Commission itself found, *Trinity,* 14 F.C.C.R. at 13601 ¶ 85, they may have "confused" high-power applicants like Trinity.

The Commission responds that the *absence* of a similar statement in connection with section 73.3555 should have alerted Trinity that a majority-minority board was *in*sufficient for section 73.3555 purposes. But the standard is "ascertainable certainty." Although we agree with the Commission that its statements in the low-power context do not "carr[y] over automatically" into the full-power realm, we also think that where, as here, the agency failed to provide a relevant definition for the key regulatory term—"minority controlled"—the applicant is entitled to rely on the agency's prior interpretation of a nearly

identical regulation. *See Satellite Broad.,* 824 F.2d at 4 ("The Commission through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules. Otherwise the practice of administrative law would come to resemble 'Russian Roulette.'").

Given the facts of this case, Trinity's interpretation of section 73.3555 as requiring only a majority-minority board is particularly understandable. After NMTV's predecessor, TTI, applied for low-power/translator television licenses, the Commission issued its low-power/translator television minority preference regulation along with its statement "that nonstock corporations ... should be judged as to minority status on the basis of the composition of the board." *Random Selection Lotteries,* 93 F.C.C.2d at 977. Issuing a Public Notice informing TTI and other low-power/translator television license applicants of section 1.1622's passage and instructing them to complete supplemental forms regarding their eligibility for minority preferences, the Commission reiterated: For "non-stock corporations ... [i]f a majority of the governing board ... are minorities, the entity is entitled to a minority preference." *Public Notice,* Mimeo No. 6030 at 4 (released August 19, 1983). When NMTV moved into the high-power, commercial television realm with its Odessa license application, nothing in section 73.3555 signaled that the Commission might require non-stock corporations to demonstrate anything beyond a majority-minority board. No wonder Crouch, acting on the advice of counsel, assumed that if the company was entitled to a minority preference under the low-power regulation, the Commission would consider it "minority-controlled" under the virtually identical high-power regulation. NMTV's commercial television station license applications, moreover, disclosed that NMTV was operating on exactly that belief. In support of NMTV's claims to minority preferences, the applications stated that "a majority of its directors are minorities, and

NMTV is therefore minority controlled." Based on both these representations and its own investigation into NMTV's license application, the Commission awarded NMTV the Odessa license. May testified that the award of the Odessa license "further confirmed my belief that NMTV's structure complied with Commission policy." Not until the Commission began inquiring into NMTV's application for the Wilmington license did the agency give NMTV any reason to believe that "minority-controlled" might mean something beyond a majority-minority board.

Neither Note 1 nor the Commission's footnote reference to its 1982 Policy Statement gave Trinity "fair notice" that the Commission was abandoning its low-power approach and interpreting section 73.3555 to require minority directors of non-profit organizations to demonstrate actual control. Even setting aside the fact that the 1982 Policy Statement appears only in a footnote, *see McElroy Electronics Corp. v. FCC,* 990 F.2d 1351, 1366 (D.C.Cir.1993) (cautioning the Commission "not to bury what it believes to be the heart of its order in the last line of a footnote"), because the Commission has equated seats on non-profit boards with "ownership" in other contexts, *see Hearing Designation Order,* 8 F.C.C.R. at 2475 ¶ 4 n. 1 ("In a non-stock corporation the Commission normally looks to directors in evaluating ownership and control.") (*citing Roanoke,* 52 R.R.2d 1725), a non-profit applicant could reasonably interpret Note 1 and the 1982 Policy Statement to mean that a non-profit entity would have to show either that it had a majority-minority board or that minorities had actual control, not both. *See Trinity,* 14 F.C.C.R. at 13628–30 (Commissioners Furchtgott–Roth and Powell, dissenting in part).

Nor can we find "ascertainable certainty" in *Southwest Texas.* Perhaps in hindsight the Commission's action in that case—determining whether an unauthorized transfer of control had occurred by

going beyond the formality of legal title to examining a television station's actual operations—could reflect a "long-standing" policy of looking at actual, rather than formal, control. But the Commission had given no indication that a general policy expressed in *Southwest Texas*, a case arising in a different factual setting under a different provision of the Communications Act, would transfer to section 73.3555's definition of "minority-controlled."

■ Finally, section 73.3555's underlying purpose cannot provide the fair notice required by due process. Before an agency can sanction a company for its failure to comply with regulatory requirements, the agency "must have either put this language into [the regulation] itself, or at least referenced this language in [the regulation]." *Chrysler*, 158 F.3d at 1356. General references to a regulation's policy will not do.

We find the Commission's insistence that section 73.3555 provided fair notice particularly problematic in view of the Commission's failure to explain satisfactorily how denying Trinity's license can be reconciled with cases where it found regulatory requirements too unclear to justify sanctioning other broadcasters. In *Fox Television Stations, Inc.*, 10 F.C.C.R. 8452, 1995 WL 262295 (1995), *on reconsideration*, 11 F.C.C.R. 5714, 1995 WL 447416 (1995), for example, the Commission ruled that when determining whether a licensee had exceeded a twenty-five percent statutory benchmark for alien ownership, it would measure "ownership" by considering the percentage of alien equity capital contributions rather than the percentage of outstanding shares of all classes of stock held by aliens. Measured by that standard, Fox's alien ownership far exceeded the statutory benchmark because "foreign interests contributed more than 99% of the capital of all classes of stock," a fact that Fox's applications failed to reveal. *Id.* at 8474 ¶ 50. Concluding, however, that Fox's interpretation of the statute as requiring it to report only the percentage of

alien stock ownership was "not facially implausible," *id.* at 5808 ¶ 137, and that "our reported decisions ... would not *necessarily* have led a reasonable applicant" to the conclusion that the Commission would measure ownership in terms of equity contributions, the Commission chose not to deny Fox's license renewal. *Id.* at 8486 ¶ 82 (emphasis added). The Commission reached a similar result in *CBS, Inc.*, 69 F.C.C.2d 1082, 1092–93, 1978 WL 36021 (1978), refusing to deny CBS licenses in spite of the company's "misrepresentations" to the Commission: "Since there have been no prior cases of a similar nature to serve as examples ... network management heretofore has not been made aware ... of the grave consequences to the licensee which can result from such misrepresentations of facts to the Commission." *See also Roy M. Speer*, 11 F.C.C.R. 18393, 18422–23, 1996 WL 335785 (1996) (concluding that Silver King, a Home Shopping Network spin-off, had violated the FCC's ownership attribution rules, but refusing to revoke its license "given the various legal conclusions that can be drawn from Silver King's documented activities.")

If Fox's "not facially implausible" interpretation did not warrant denying its license renewal application, how can Trinity's "perhaps literally accurate" (the Commission's own words) interpretation justify denying its license renewal application? If the absence of "prior cases of a similar nature to serve as examples" persuaded the Commission not to sanction CBS for its misrepresentations, how can the Commission justify penalizing Trinity in view of the fact that not only was there no agency precedent regarding control of nonprofits, but Commission statements supported Trinity's belief that a majority-minority board was sufficient to obtain a minority preference? The Commission never answers these questions— not in its decision, not in its brief, not at oral argument. *See Orion Communications Ltd. v. FCC*, 131 F.3d 176, 181

(D.C.Cir.1997) ("Although the Commission is not necessarily bound by its prior decisions, ... the Commission is bound to provide an explanation when it departs from a clear precedent.").

■ For all of these reasons, our conclusion in *GE* applies here as well: "Where, as here, the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished." 53 F.3d at 1333–34.

### IV

■ The Commission contends that even "[i]f the Court disagrees with our assessment" that the regulation clearly required *de facto* minority control, "it may still find that TBN intended to mislead the Commission by creating a sham ownership structure...." Conceding that the commercial television station application asked for information about neither the TBN/NMTV relationship nor Duff's employment with TBN, the Commission faulted Trinity because "[a] reasonable person could appreciate that if all the circumstances had been made clear, the Commission would have had ample reason to inquire further and ultimately to deny NMTV's application." *Trinity*, 14 F.C.C.R. at 13601 ¶ 84. But this argument rests entirely on the Commission's flawed conclusion that the regulation clearly required *de facto* minority control. Unless the *de facto* control requirement was ascertainably certain, a "reasonable person" would not have been able to "appreciate" the need to disclose these facts. Indeed, in view of the low-power regulation's statement that a majority-minority board entitled an entity to a minority preference, a "reasonable person" might well have thought that information about the relationship between NMTV and TBN was irrelevant. Asked about this at oral argument, Commission counsel can-didly conceded that if the regulation was not clear, Trinity would have had no obligation to disclose the omitted information because it would not have known that the information was at all "material."

The Commission also argues that Trinity had actual notice of the *de facto* control requirement. Not only does this amount to a *post-hoc* rationalization—the Commission nowhere relied on actual knowledge as a basis for finding abuse of process, *see SEC v. Chenery*, 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.")—it also rests on the Commission's misleading use of a fragment of the testimony of Trinity's lawyer, Colby May. The Commission's brief quotes May as saying: " 'I understood always that the Board of Directors of [NMTV] had to be the parties that were in fact controlling and operating [NMTV].' " The Commission neither quotes nor acknowledges the second half of May's sentence: " ... and they did that by coming to meetings, participating in the discussions at meetings, voting at meetings, and generally directing the policies and affairs of the company." It was because of this advice that, after NMTV was awarded the Odessa license, its board began observing these formalities. Asked about all of this at oral argument, Commission counsel conceded that there was no actual notice and that if we were to disagree with the Commission's conclusion that the regulation was clear, "that's the end of the case."

The Commission's denial of Trinity's license renewal application is vacated.

*So ordered.*