SCIRICA, Circuit Judge,
Dissenting.
This case comes to us on remand from the Supreme Court of the United States. CBS petitions for review of orders by the Federal Communications Commission imposing a monetary forfeiture under 47 U.S.C. § 503(b) for the broadcast of “indecent” material in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. I believe the Supreme Court’s intervening opinion in FCC v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009), undermines the basis of our prior holding on the Administrative Procedure Act.[1] Accordingly, I respectfully dissent and would hold the FCC’s imposition of a civil forfeiture here is neither arbitrary nor capricious. Furthermore, I would hold precedent requires we remand to the FCC for it to apply the proper standard for ordering a civil forfeiture for the broadcast of indecent material.
The alleged indecency occurred during the Halftime Show of Super Bowl XXXVIII, broadcast live by CBS on February 1, 2004. The Show’s finale involved a routine by Janet Jackson and Justin Timberlake. In an unscripted moment at the end of the performance, Timberlake tore away part of Jackson’s bustier, exposing her bare right breast to the camera. The image was broadcast over public airwaves for nine-sixteenths of one second.
At issue is the responsibility of television broadcasters for the transmission of unscripted “indecent” material during live, contemporaneous television shows. Broadcast television (as opposed to transmissions over cable, satellite, or internet) is subject to greater oversight because the finite number of broadcast frequencies are allocated among competing applicants. *153 See Red Lion Broad. Co. v. FCC, 395 U.S. 367, 376, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (“Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard.”); of. FCC v. Pacifica Found., 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (“[0]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection.”). The “scarcity doctrine” — the idea that limited broadcast spectrum and practical factors make television broadcasting unique among media — “has required some adjustment in First Amendment analysis.” FCC v. League of Women Voters, 468 U.S. 364, 376-77, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984).[2]
In our earlier decision, we invalidated the FCC’s determination that CBS’s broadcast of a fleeting image of nudity was actionably indecent. Examining the history of the FCC’s enforcement of the indecency standard, we concluded the FCC’s policy had been to treat unscripted fleeting material as per se exempt from regulation. Because we believed the FCC’s forfeiture orders against CBS constituted an unacknowledged change in policy, we held they violated the Administrative Procedure Act’s (APA) prohibition on arbitrary and capricious agency action. See 5 U.S.C. § 706(2)(A). Furthermore, even assuming the fleeting image of nudity was actionably indecent, we concluded CBS could not be held liable for the broadcast unless it acted with scienter, and it was unclear whether the FCC had applied the proper standard. Accordingly, we vacated the FCC’s orders and remanded to allow the FCC an opportunity to reconsider its indecency standard and the mens rea for broadcaster liability.
The FCC filed a petition for certiorari. While that petition was pending, the Supreme Court decided FCC v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). The question presented in Fox was whether the FCC had violated the APA in issuing orders holding Fox liable for isolated expletives broadcast during the 2002 and 2003 Billboard Music Awards. The Court held the FCC had adequately explained its decision such that its orders were neither arbitrary nor capricious under the APA. Soon after deciding Fox, the Court granted the FCC’s petition for certiorari in this case, vacated our judgment, and remanded for us to reconsider the case in light of Fox. FCC v. CBS Corp., — U.S. —, 129 S.Ct. 2176, 173 L.Ed.2d 1153 (2009).
In Fox, unlike here, the FCC acknowledged it was departing from precedent. Nevertheless, I believe the Court’s intervening decision in Fox requires us to revise our prior APA holding. Based on the Supreme Court’s account of the history of the FCC’s enforcement policy, we cannot adhere to our earlier determination that prior FCC policy had granted a per se exemption to all fleeting indecent material; instead, Fox compels the conclusion that *154 the fleeting exemption was limited to a particular type of words. Accordingly, under Fox, I cannot say the orders in this case represented a change in agency policy, and I would hold the FCC’s indecency finding passes muster under the APA. The FCC, however, cannot impose a forfeiture penalty unless CBS acted with the requisite scienter. Because I believe the FCC’s forfeiture orders rested on the wrong statutory provision, and misapprehended the proper mens rea standard, I would vacate the orders and remand for further proceedings.
I.
A.
Our previous opinion set forth the relevant facts:
On February 1, 2004, CBS presented a live broadcast of the national Football League’s Super Bowl XXXVIII, which included a halftime show produced by MTV Networks. Nearly 90 million viewers watched the Halftime Show, which began at 8:30 p.m. Eastern Standard Time and lasted about fifteen minutes. The Halftime Show featured a variety of musical performances by contemporary recording artists, with Janet Jackson as the announced headlining act and Justin Timberlake as a “surprise guest” for the final minutes of the show.
Timberlake was unveiled on stage near the conclusion of the Halftime Show. He and Jackson performed his popular song “Rock Your Body” as the show’s finale. Their performance, which the FCC contends involved sexually suggestive choreography, portrayed Timberlake seeking to dance with Jackson, and Jackson alternating between accepting and rejecting his advances. The performance ended with Timberlake singing, “gonna have you naked by the end of this song,” and simultaneously tearing away part of Jackson’s bustier. CBS had implemented a five-second audio delay to guard against the possibility of indecent language being transmitted on air, but it did not employ similar precautionary technology for video images. As a result, Jackson’s bare right breast was exposed on camera for nine-sixteenths of one second.
CBS Corp. v. FCC, 535 F.3d 167, 171-72 (3d Cir.2008) (footnote omitted).
After fielding a large number of complaints from viewers of the Halftime Show, the FCC issued a letter of inquiry to CBS seeking additional information about the broadcast. CBS complied. It also made “a public statement of apology for the incident,” stating that “Jackson and Timber-lake’s wardrobe stunt was unscripted and unauthorized” and “claiming it had no advance notice of any plan by the performers to deviate from the script.” Id. at 172.
On September 22, 2004, the FCC issued a Notice of Apparent Liability finding that CBS had apparently violated federal law and FCC rules regulating the broadcast of indecency and was apparently liable for a forfeiture penalty of $550,000. CBS submitted its Opposition to the Notice.
On March 15, 2006, the FCC issued a forfeiture order and imposed a penalty of $550,000. In re Complaints Against Various Television Licensees Concerning Their Feb. 1, 2004 Broad, of the Super Bowl XXXVIII Halftime Show, 21 FCC Red. 2760 (2006) (“Forfeiture Order”). Applying the standard set forth in its 2001 policy statement, the FCC found the Halftime Show incident satisfied the two-part test for indecency: (1) “the material must describe or depict sexual or excretory organs or activities,” and (2) it must be “patently offensive as measured by contemporary community standards for the broadcast medium.” In re Industry Guid *155 anee on the Comm’n’s Case Law Interpreting 18 U.S.C. § 1161 and Enforcement Policies Regarding Broad. Indecency, 16 FCC Red. 7999, 8002, ¶¶7-8 (2001) (“Industry Guidance ”); see Forfeiture Order, 21 FCC Red. at 2764-65, ¶ 9. Finding the “broadcast of an exposed female breast” met the first part of the test, the FCC focused most of its analysis on whether the broadcast was “patently offensive.” Forfeiture Order, 21 FCC Red. at 2764-67, ¶¶ 9-14.
The FCC’s 2001 policy statement had explained that in determining whether broadcast material is patently offensive, “the full context in which the material appeared is critically important.” Industry Guidance, 16 FCC Red. at 8002, ¶ 9. Three factors are of principal significance: “(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value.” Id. at 8003, ¶ 10 (emphasis removed). According to the policy statement, “[n]o single factor generally provides the basis for an indecency finding”; the three factors “must be balanced” to determine whether a given broadcast is patently offensive. Id.
Applying these factors in its Forfeiture Order, the FCC determined that, “in context and on balance,” the Halftime Show material was “patently offensive.” 21 FCC Red. at 2765, ¶ 10. The FCC conceded the second factor weighed against a finding of indecency because “the image of Jackson’s uncovered breast ... is fleeting.” Id. at 2766, ¶ 12. It noted, however, that “ ‘even relatively fleeting references may be found indecent where other factors contribute to a finding of patent offensiveness,’ ” and concluded “[i]n this case, ... the brevity of the partial nudity is outweighed by the first and third factors of our contextual analysis.” Id. (quoting Industry Guidance, 16 FCC Red. at 8009, ¶ 19). In the FCC’s view, the image was “graphic and explicit” because “although the camera shot is not a close-up, the nudity is readily discernible[,] ... Jackson and Timberlake, as the headline performers, are in the center of the screen, and Timberlake’s hand motion ripping off Jackson’s bustier draws the viewer’s attention to her exposed breast.” Id. at 2765, ¶ 11. The FCC also believed, taken in context, the material appeared to shock, pander to, or titillate the audience:
The offensive segment in question did not merely show a fleeting glimpse of a woman’s breast.... Rather, it showed a man tearing off a portion of a woman’s clothing to reveal her naked breast during a highly sexualized performance and while he sang “gonna have you naked by the end of this song.”
Id. at 2767, ¶ 13. On the strength of these two factors, the FCC found the image actionably indecent.
The Forfeiture Order also found that CBS was liable under 47 U.S.C. § 503(b)(1) for Timberlake and Jackson’s performance. CBS claimed “it had no advance knowledge that Timberlake planned to tear off part of Jackson’s clothing to reveal her breast.” Id. at 2768, ¶ 17. The FCC did not dispute this contention, but it nonetheless determined CBS was subject to a monetary forfeiture. Id. at 2769-74, ¶ ¶ 18-25.
CBS submitted a Petition for Reconsideration challenging several aspects of the FCC’s analysis. In an Order on Reconsideration filed on May 31, 2006, the FCC reaffirmed the $550,000 forfeiture. In re Complaints Against Various Television Licensees Concerning Their Feb. 1, 2001 *156 Broad. of the Super Bowl XXXVIII Halftime Show, 21 FCC Red. 6653 (2006) (“Reconsideration Order”). The Order rejected CBS’s constitutional arguments and reiterated the FCC’s indecency finding. The Reconsideration Order revised the FCC’s approach for determining CBS’s liability under § 503(b)(1). According to the Order, there were three independent bases for CBS’s liability. First, despite the fact the network “was acutely aware of the risk of unscripted indecent material in [the Halftime Show],” it “consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast.” Reconsideration Order, 21 FCC Red. at 6660, ¶ 17; accord id. at 6662, ¶ 23 (stating that the FCC’s “finding of willfulness is based on CBS’s knowledge of the risks and its conscious and deliberate omissions of the acts necessary to address them”). Second, the FCC found Jackson and Timberlake performed as employees of CBS, not independent contractors. Accordingly, CBS was vicariously liable for their actions under the doctrine of respondeat superior. Id. at 6662-64, ¶¶ 24-28. Third, even if Timberlake and Jackson were independent contractors, CBS would still be liable for their actions in the FCC’s view because of “the nondelegable nature of broadcast licensees’ responsibility for their programming.” Id. at 6662, ¶ 23. For these reasons, the FCC refused to rescind or reduce its forfeiture penalty.
B.
CBS timely filed a petition for review of the Reconsideration Order on July 28, 2006. In our previous opinion, we agreed with CBS that the order’s indecency finding violated the APA. CBS, 535 F.3d at 175. We acknowledged that “[t]he scope of review under the [APA’s] ‘arbitrary and capricious’ standard is ‘narrow, and a court is not to substitute its judgment for that of the agency,’ ” and that “[l]ike any agency, the FCC may change its policies without judicial second-guessing.” Id. at 174-75 (quoting Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). But we noted the FCC “cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure.” Id. at 175.
We concluded the FCC violated that principle here by failing to acknowledge or explain a departure from “a consistent and entrenched policy of excluding fleeting broadcast material from the scope of actionable indecency.” Id. at 179. In our view, it was not until its Golden Globes decision, issued more than a month after the Halftime Show, that the agency expressly “overruled all of its prior cases holding [isolated or fleeting material] not actionable.” Id. at 178; see In re Complaints Against Various Broad. Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 19 FCC Red. 4975, 4980, ¶ 12 (2004) (“Golden Globes ”) (“While prior Commission and staff action had indicated that isolated or fleeting broadcasts of the ‘F-Word’ such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law.”). Before this date, we believed, “the FCC’s policy was to exempt fleeting or isolated material” from indecency regulation. CBS, 535 F.3d at 180. “Because CBS broadcasted the Halftime Show prior to Golden Globes, this was the policy in effect when the incident with Jackson and Timberlake occurred.” Id. Accordingly, by finding the fleeting image here to be actionably indecent, the FCC’s orders in this case broke with agency policy. And since these orders failed to acknowledge the existence of *157 that policy, we determined they were “unable to comply with the [APA’s] requirement ... that an agency supply a reasoned explanation for its departure” from its prior policy. Id. at 188.
As this account suggests, our construction of the FCC’s enforcement history played a decisive role in our previous opinion. That opinion recounted this history in detail, see id. at 175-89, but a synopsis is necessary here in order to make clear the significance of the Supreme Court’s decision in Fox. The FCC’s indecency policy had its genesis in 1975, when the FCC issued a forfeiture penalty against Pacifica Foundation for broadcasting comedian George Carlin’s “Filthy Words” monologue.[3] See In re Citizen’s Complaint Against Pacifica Found., Station WBAI(FM), New York, N.Y., 56 F.C.C.2d 94, 1975 WL 29897 (1975). “Carlin’s monologue, which Pacifica aired in an early-afternoon time slot, contained extensive and repetitive use of several vulgar expletives over a period of twelve minutes.” CBS, 535 F.3d at 175 (citing Pacifica, 438 U.S. at 739, 98 S.Ct. 3026). While Pacifica’s appeal was pending before the United States Court of Appeals for the D.C. Circuit, the FCC “issued a clarification order ... expressly limiting its prior forfeiture order to the specific facts of the Carlin monologue.” Id. (citing In re a Petition for Clarification or Reconsideration’ of a Citizen’s Complaint against Pacifica Found., Station WBAI(FM), New York, NY, 59 F.C.C.2d 892, 1976 WL 31850 (1976)). The D.C. Circuit reversed the FCC’s forfeiture order as vague and over-broad, Pacifica Found. v. FCC, 556 F.2d 9, 14 (D.C.Cir.1977), but the Supreme Court upheld the agency’s action in a narrow plurality opinion, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). The plurality “confirmed the general validity of the FCC’s indecency regime” while at the same time “ ‘emphasizing] the narrowness of [its] holding,’ which it confined to the facts of the Carlin monologue.” CBS, 535 F.3d at 176 (quoting Pacifica, 438 U.S. at 750, 98 S.Ct. 3026) (alterations in original). Justices Powell and Blackmun concurred in the judgment and wrote separately to underscore “the narrowness of the decision and to note the Court’s holding did not ‘speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here.’ ” Id. (quoting Pacifica, 438 U.S. at 760-61, 98 S.Ct. 3026 (Powell, J., concurring)).
Our previous opinion found that the FCC adopted a “restrained enforcement policy ... in the years following Pacifica.” Id. In a 1978 opinion, the FCC rejected a challenge to “several programs containing nudity and other allegedly offensive material.” Id; see In re Application of WGBH Educ. Found., 69 F.C.C.2d 1250, 1978 WL 36042 (1978) (“WGBH”). The agency, noting it “‘intended] strictly to observe the narrowness of the Pacifica holding’ and emphasizing the language in Justice Powell’s concurring opinion, concluded the single use of an expletive in a program ‘should not call for us to act under the holding of Pacifica.’ ” Id. (quoting WGBH, 69 F.C.C.2d at 1254, ¶ 10 n. 6) (alteration in CBS).
In our view, three decisions issued in 1987 had “reaffirmed the Commission’s restrained enforcement policy and reiterated the agency’s policy that isolated or fleeting *158 material would not be considered action-ably indecent.” Id. We acknowledged that, in a subsequent order reconsidering these decisions, “the Commission abandoned the view that only the particular ‘dirty words’ used in the Carlin monologue could be indecent,” but we observed that the order on reconsideration “never indicated] disagreement with those decisions’ express statements that isolated or fleeting material could not be actionably indecent.” CBS, 535 F.3d at 177; see In re Infinity Broad. Corp., 3 FCC Red. 930 (1987), vacated in part on other grounds, Action for Children’s Television v. FCC, 852 F.2d 1332, 1337 (D.C.Cir.1988), superseded in part by Action for Children’s Television v. FCC, 58 F.3d 654 (D.C.Cir.1995) (en banc).
As noted, our earlier opinion concluded the Golden Globes opinion of March 3, 2004, was the first time the FCC indicated that fleeting material could be held indecent. That case involved an unscripted remark during a live NBC broadcast of the Golden Globe Awards on January 19, 2003, in which “musician Bono said ‘this is really, really f[* * *] brilliant’ while accepting an award.” CBS, 535 F.3d at 177; see Golden Globes, 19 FCC Red. at 4976, ¶ 3 n. 4. The FCC held the broadcast actionable, but it declined to impose a forfeiture penalty because “existing precedent would have permitted th[e] broadcast.” See Golden Globes, 19 FCC Red. at 4981-82, ¶ 15 n. 40 (citing Trinity Broad. of Fla., Inc. v. FCC, 211 F.3d 618 (D.C.Cir.2000)). We believed Golden Globes itself “made it clear that licensees could not be held liable for broadcasting fleeting or isolated indecent material prior to its Golden Globes decision.” CBS, 535 F.3d at 178.
On February 21, 2006, the FCC issued an omnibus order resolving multiple indecency complaints against television broadcasters. See In re Complaints Regarding Various Television Broads. Between Feb. 2, 2002 and Mar. 8, 2005, 21 FCC Red. 2664 (2006). The Order found four programs, all of which involved the use of expletives,[4] to be indecent. But “[b]ecause the offending broadcasts occurred prior to the issuance of its Golden Globes decision, the FCC concluded that existing precedent would have permitted the broadcasts. Accordingly, the FCC did not issue forfeiture orders against any of the licensees.” CBS, 535 F.3d at 178 (internal citations removed).
The networks nonetheless appealed the Order, which, as revised,[5] was invalidated in a 2-1 decision by the United States Court of Appeals for the Second Circuit. See Fox Television Stations, Inc. v. FCC, 489 F.3d 444 (2d Cir.2007), rev’d, 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 *159 (2009). Our earlier opinion explicitly refrained from engaging the issue that split the Second Circuit panel, see CBS, 535 F.3d at 182-83; we focused instead on that court’s unanimous finding that the FCC’s enforcement policy “prior to the Golden Globes decision [had consistently] excluded fleeting or isolated expletives from regulation,” id. at 179 (citing Fox, 489 F.3d at 455). That conclusion, we believed, confirmed our view that until Golden Globes, the FCC’s policy “was to exclude fleeting material from the scope of actionable indecency.” Id. at 179 n. 10.
The FCC did not categorically deny that its policy had exempted fleeting content from regulation. But it contended — and continues to contend — that the exemption had been limited to fleeting expletives and had never applied to fleeting images such as the one at issue here. According to the FCC, the Golden Globes opinion simply eliminated the exceptional treatment of fleeting expletives and subjected all broadcast content to the same contextual, multifactor test, in which the material’s fleeting nature is but one consideration to be weighed in the balance. Our previous opinion rejected this interpretation. We concluded that, on the contrary, “[i]n the nearly three decades between the Supreme Court’s ruling in Pacifica and CBS’s broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content.” Id. at 184; see id. at 181 (“[T]he Commission — before Golden Globes — had not distinguished between categories of broadcast material such as images and words.”); see also id. at 180 (“Until its Golden Globes decision ... the FCC’s policy was to exempt fleeting or isolated material from the scope of actionable indecency.” (emphasis added)). In our view, fleeting images, like all other fleeting content, were immune from regulation under the pre-Golden Globes regime. Accordingly, we believed that if the FCC were right that “Golden Globes only addressed expletives, ... a residual [per se exemption] policy on other categories of fleeting material — including all broadcast content other than expletives — remained in effect,” and that “subsequent agency action was required to change the fleeting material policy as it applied” to these remaining categories. Id. at 181.
The FCC had insisted that “any doubts about the historical breadth of its fleeting material policy prior to the Halftime Show” should have been “dispelled” by the FCC’s decision in In re Young Broadcasting of San Francisco, Inc., 19 FCC Red. 1751 (2004), issued a few days before CBS’s Super Bowl broadcast. CBS, 535 F.3d at 186. There, the FCC issued a Notice of Apparent Liability for Forfeiture to:
a morning news show segment in which two performers from a production titled “Puppetry of the Penis” appeared in capes but were otherwise naked underneath the capes. The two men, whose act involved manipulating and stretching their genitalia to simulate various objects, performed a demonstration of their act with the agreement of the show’s hosts and at the urging of off-camera station personnel. Although the performance was directed away from the camera, the penis of one performer was fully exposed on camera for less than one second as the men turned away to act out their performance.
Id. (citing Young Broad., 19 FCC Red. at 1755-56, ¶¶ 12, 13). The FCC conceded that the offending image was “fleeting” but concluded it was nonetheless indecent given its explicit and pandering qualities. Young Broad., 19 FCC Red. at 1755-57, ¶¶ 11-14. In the FCC’s view, Young Broadcasting should have made clear to CBS that the fleetingness of an offending *160 image would not necessarily immunize the broadcaster from liability.
Our previous opinion found this argument unconvincing. We believed the FCC’s action in Young Broadcasting was hobbled by the same flaw that afflicted the forfeiture orders against CBS: it “fail[ed] to acknowledge the existence of [the FCC’s] prior policy on fleeting material,” instead “readfing] the policy [of exempting fleeting material] out of existence by substituting new rationales for its prior indecency determinations that had applied the policy.” CBS, 535 F.3d at 187. Because Young Broadcasting was, we believed, an invalid “initial effort to abandon [the FCC’s] restrained enforcement policy on fleeting material,” id., that policy remained in effect at the time of the Halftime Show. And since the forfeiture orders against CBS similarly “fail[ed] to acknowledge” a change in FCC policy “on fleeting material,” they were “unable to comply with the requirement ... that an agency supply a reasoned explanation for its departure from prior policy.” Id. at 188 (citing State Farm, 463 U.S. at 43, 103 S.Ct. 2856). In sum, Young Broadcasting did not alter our conclusion that the FCC’s orders violated the APA.
This violation of the APA was not the only flaw we identified in the FCC’s orders. Even assuming the FCC’s indecency finding had been valid, we would have found “the Commission [had] incorrectly determined CBS’s liability for Jackson and Timberlake’s Halftime Show performance.” Id. at 189. Two of the FCC’s three arguments for liability were untenable. First, the agency “contend[ed] the performers’ intent c[ould] be imputed to CBS under the common law doctrine of respondeat superior.” Id. We concluded, however, that “Jackson and Timberlake were independent contractors, who are outside the scope of respondeat superior, rather than employees as the FCC found.” Id. at 189-98. Second, the FCC argued “because broadcast licensees hold non-delegable duties to avoid the broadcast of indecent material and to operate in the public interest,” they are vicariously liable for the acts of even their independent contractors. Id. at 198. This proposition, we believed, could not be reconciled with the First Amendment. “[A]n unwitting broadcaster might be held liable for its independent contractor’s negligence in monitoring and maintaining a tower antenna without raising a constitutional question,” but “the same cannot be said of imposing liability for the speech or expression of independent contractors.” Id. at 199. “A broadcast licensee,” we explained, “should not be found liable for violating the indecency provisions of [federal law] without proof the licensee acted with scienter. Because the Commission’s proffered ‘non-delegable duty’ theory of CBS’s vicarious liability, which functionally equates to strict liability for speech or expression of independent contractors, appears to dispense with this constitutional requirement,” we concluded it could “not be sustained.” Id. at 203.
“As an alternative to vicarious liability, the FCC found CBS directly liable for a forfeiture penalty ... for failing to take adequate precautionary measures to prevent potential indecency during the Halftime Show.” Id. According to the FCC, the touchstone under this theory was whether CBS had “acted willfully.” Reconsideration Order, 21 FCC Red. at 6655, ¶ 5. The FCC did “not dispute” that CBS “neither planned Jackson and Timberlake’s offensive actions nor knew of the performers’ intent to incorporate those actions into their performance.” CBS, 535 F.3d at 189. But the FCC believed CBS had satisfied the “willfulness” requirement based on the agency’s finding that “CBS was acutely aware of the risk of unscripted indecent material” in the Halftime Show, but had *161 nonetheless “consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast.” Reconsideration Order, 21 FCC Red. at 6660, ¶ 17.
Without ruling on whether this third theory might ultimately sustain a finding of liability on the facts of this ease, we found certain key aspects of the FCC’s reasoning “unclear.” CBS, 535 F.3d at 189. First, we had doubts about whether the agency had “properly applied the forfeiture statute.” Id. at 203; see 47 U.S.C. § 503(b)(1). Under 47 U.S.C. § 503(b)(1)(B), the FCC has authority to order forfeiture penalties upon determining that a person “willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter.” Another statutory subsection, § 503(b)(1)(D), authorizes forfeitures for violations of several specific statutory provisions, including the indecency statute, 18 U.S.C. § 1464. See 47 U.S.C. § 503(b)(1)(D). Although the FCC’s orders sometimes specifically invoked § 503(b)(1)(B), see, e.g., Forfeiture Order, 21 FCC Red. at 2778, ¶ 36, and its “willfulness” standard appears to represent the agency’s interpretation of that subsection’s express mens rea element, the orders referred in other places to § 503(b) or § 503(b)(1) only generally, without specifying the applicable subsection, see, e.g., Forfeiture Order, 21 FCC Red. at 2760, fin. 1; Reconsideration Order, 21 FCC Red. at 6655, ¶ 5. Given that § 503(b)(1)(D) expressly authorizes forfeitures for indecency violations, we questioned “whether the statutory scheme permits violations of 18 U.S.C. § 1464 to be penalized by forfeitures issued under section 503(b)(1)(B) instead of, or in addition to, section 503(b)(1)(D).” CBS, 535 F.3d at 205.
As noted, our previous opinion determined that “a showing of scienter is constitutionally required to penalize broadcast indecency.” Id. Although § 503(b)(1)(B) contained an express mens rea standard, i.e. willfulness, and § 503(b)(1)(D) did not, we believed both provisions must be interpreted to “set a bar” to liability “at least as high as scienter.” Id. A key question, then, was what level of scienter was necessary to sustain a penalty for indecent expression. “Where a scienter element is read into statutory text,” we observed, “scienter would not necessarily equate to a requirement of actual knowledge or specific intent.” Id. at 206. Instead, “[t]he presumption in favor of scienter requires a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct.” Id. (quoting Carter v. United States, 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)). Applying this principle, we surmised that recklessness was a sufficiently culpable mental state for purposes of 18 U.S.C. § 1464. “It is likely,” we explained, “that a recklessness standard would effectively separate wrongful conduct from otherwise innocent conduct of broadcasters without creating an end-around indecency restrictions that might be encouraged by an actual knowledge or intent standard.” Id. (internal quotation marks and citation omitted). Moreover, we noted that recklessness had been found to be an adequate scienter standard in other contexts, including First Amendment contexts. Id. at 206-07.
The parties here had disputed whether CBS took adequate precautions with regard to the risk of indecency in the Halftime Show. The parties disagreed about whether certain events leading up to the broadcast — including public comments by Jackson’s choreographer that the performance would include “some shocking moments” — indicated a high risk of indecent *162 material. Another point of contention involved the role of video delay technology. Although CBS utilized a five-second audio delay, it did not delay its video broadcast. We found “[b]ecause the Commission carries the burden of showing scienter, it should have presented evidence to demonstrate, at a minimum, that CBS acted recklessly and not merely negligently when it failed to implement a video delay mechanism for the Halftime Show broadcast.” Id. at 208. Because we found the “record at present” was wanting in this regard, we were “unable to decide whether the Commission’s determination that CBS acted ‘willfully’ was proper in light of the scienter [i.e., recklessness] requirement.” Id.
Having determined the FCC’s enforcement actions here were arbitrary and capricious, our previous decision vacated the forfeiture orders and remanded. Although we recognized the FCC could “not retroactively penalize CBS” for material that was not indecent under FCC policy at the time of broadcast, we explained the agency could still enter a declaratory order on remand, “set[ting] forth a new policy and proceeding] with its indecency determination even though a retroactive monetary forfeiture [would be] unavailable.” Id. at 209. The remand also afforded the agency an opportunity to address the constitutionally required scienter element of the indecency standard.
C.
While the FCC’s petition for certiorari in this case was pending, the Supreme Court decided Fox. As noted, Fox reviewed the Second Circuit’s decision invalidating monetary forfeitures issued against Fox and its affiliates for several unscripted expletives broadcast live during two different Billboard Music Awards ceremonies.[6] The FCC’s forfeiture orders for fleeting expletives in Fox, unlike its orders penalizing a fleeting image here, “forthrightly acknowledged that [they were breaking] new ground.” Fox, 129 S.Ct. at 1812. Nonetheless, the Second Circuit had found the agency’s explanation for its policy change inadequate. In reviewing this determination, the Supreme Court gave its own account of the FCC’s enforcement history.
The Court’s chronicle, like ours, began with Pacifica’s sanction of George Carlin’s “Dirty Words” routine. Id. at 1806. The Court explained that “[i]n the ensuing years, the Commission took a cautious, but gradually expanding, approach to enforcing the statutory prohibition against indecent broadcasts.” Id. Like our previous opinion, Fox noted the FCC decided in 1987 that its enforcement power was not limited to “the seven words actually contained in the George Carlin monologue.” Id. at 1807 (quoting In re Pacifica Found., Inc., 2 FCC Red. 2698, 2699, ¶ 12 (1987)). But the Court in Fox observed something in the 1987 decisions that we had not mentioned: it found the FCC opinions expanding the scope of the agency’s enforcement also
preserved a distinction between literal and nonliteral (or ‘expletive’) uses of evocative language. The Commission explained that each literal “description or depiction of sexual or excretory functions must be examined in context to *163 determine whether it is patently offensive,” but that “deliberate and repetitive use ... is a requisite to a finding of indecency” when a complaint focuses solely on the use of nonliteral expletives.
Id. (quoting Pacifica Found., 2 FCC Red. at 2699, ¶ 13) (alteration in original) (citation omitted).
The Court in Fox found the Golden Globes decision was “the first time” the FCC declared “that a nonliteral (expletive) use of the F- and S-words could be action-ably indecent, even when the word is used only once.” Id. Because the broadcasts at issue in Fox had occurred prior to the Golden Globes order, the FCC had “declined to assess penalties.” Id. at 1812. Accordingly, the indecency determinations in Fox did not pose a notice or due process problem, and the Court’s majority opinion limited itself exclusively to the question of whether the FCC’s explanation for holding fleeting or isolated expletives indecent— which largely echoed the justification proffered in Golden Globes — passed muster under the APA.
The Court answered that question in the affirmative. The Court rejected the principle (espoused by the Second Circuit) that “agency action that changes prior policy” requires “a more substantial explanation” than does action in an area previously untouched. Id. at 1810. Although “[a]n agency may not ... depart from a prior policy sub silentio or simply disregard rules that are still on the books ... it need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one.” Id. at 1811. Accordingly, the Court concluded an “agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.” Id.
Judged under this clarified standard, the FCC orders at issue in Fox were not arbitrary and capricious. Id. at 1812-19. The FCC acknowledged its change in policy, and the Court found its reasons for including fleeting expletives within the scope of actionable indecency to be “entirely rational.” Id. at 1812. In making this determination, the Court compared the FCC’s policy toward fleeting expletives with its treatment of other offensive material. “It was certainly reasonable,” the Court believed, for the agency “to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent.” Id. The per se exemption for fleeting expletives, the Court explained, had been an anomaly:
When confronting other requests for per se rules governing its enforcement of the indecency prohibition, the Commission ha[d] declined to create safe harbors for particular types of broadcasts. The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was per se nonactionable because that was at odds with the Commission’s overall enforcement policy.
Id. at 1813 (internal citations and quotation marks omitted). Because “[e]ven isolated utterances can be made in pand[ering,] ... vulgar and shocking manners,” the Court found it rational for the FCC to cease providing “a safe harbor for single words” and subject them instead to the agency’s general “context-based” test for “patent offensiveness.” Id. at 1812-13 (internal quotation marks omitted) (second alteration and omission in original).
II.
According to the FCC, Fox stands for the proposition that the safe harbor had extended only to isolated expletives, i.e. non-literal language, and not, as we had originally concluded, to all fleeting materi *164 al. The FCC points to Fox’s statement that FCC policy historically subjected “description[s] or depiction[s]” of sexual organs or functions to a contextual standard, reserving a safe harbor only for “nonliteral expletives.” Id. at 1807 (quoting Pacifica Found., 2 FCC Red. at 2699, ¶ 13). Because images are “depictions,” the FCC argues, Fox tells us that images were not entitled to a safe harbor.
CBS, by contrast, denies that anything in Fox undermines our previous conclusion that the FCC’s forfeiture orders represented a change in policy. “Fox,” CBS argues, “does not involve allegedly indecent images, and focuses solely on words uttered.” CBS Letter-Brief 6 (Jan. 29, 2010). In CBS’s view, Fox’s discussion of the 1987 FCC opinion Pacifica Foundation is “utterly irrelevant” to the issue before us. Id. at 1. In its view, Fox’s identification of a distinction between the treatment of literal utterances and nonliteral expletives is merely background information incidental to the Supreme Court’s holding and therefore dicta. The FCC, on the other hand, argues the Court’s description of the FCC’s historic enforcement policy is integral to its holding that the FCC orders in Fox complied with the APA.
I believe Fox’s distinction between the FCC’s historic treatment of different kinds of fleeting material undermines a key premise of our earlier opinion. Our opinion did not rest on an explicit statement by the FCC that fleeting images would be per se exempt from indecency regulation. Instead, we identified FCC decisions that had held certain isolated words immune from the enforcement regime. See, e.g., CBS, 535 F.3d at 176 (quoting WGBH, 69 F.C.C.2d at 1254, ¶ 10 n. 6). In addition, after reviewing the entirety of the agency’s enforcement history up until the Halftime Show, we found “the FCC had never varied its approach to indecency regulation based on the format of broadcasted content.” Id. at 184. Accordingly, we concluded the FCC’s enforcement policy had contained a blanket rule exempting all fleeting material, without qualification, from the indecency standard.
In Fox, however, the Supreme Court states that FCC policy did, in fact, make distinctions “based on the format of broadcasted content.” As the Court interpreted the FCC’s pre-Golden Globes enforcement history, “literal ‘description[s] or depiction[s] of sexual or excretory functions’” were subject to a multifactor test and could potentially be found indecent notwithstanding their fleeting or nonrepetitive character, Fox, 129 S.Ct. at 1807 (quoting Pacifica Found., 2 FCC Red. at 2699, ¶ 13); the safe harbor for fleetingness encompassed only the “use of nonliteral expletives,” id. “Although the Commission had expanded its enforcement beyond the ‘repetitive use of specific words or phrases,’ it preserved a distinction between literal and nonliteral (or ‘expletive’) uses of evocative language.” See id. at 1807. Fox therefore contradicts and undermines our previous holding that FCC enforcement policy embodied a general exemption for all fleeting material.[7] *165 Moreover, Fox describes the narrow safe harbor for fleeting “nonliteral expletives” or “evocative language” as a deviation from the default rule of contextual analysis. The per se exemption, Fox explains, was “at odds with the Commission’s overall enforcement policy.” Id. at 1813. “When confronting other requests for per se rules governing its enforcement of the indecency prohibition, the Commission ha[d] declined to create safe harbors for particular types of broadcasts.” Id.
In other words, Fox identifies contextual analysis as the default policy for all broadcast content, with the narrow exception of nonliteral expletives. Although my colleagues emphasize the omission of any specific discussion of images in Fox, our earlier opinion’s finding of a safe harbor for fleeting images was premised on a per se exemption for fleeting content generally. As Fox portrays the FCC’s enforcement history, however, no such general policy existed. Instead, the Court concluded that the safe harbor for fleeting nonliteral expletives was an isolated exception rather than an instance of a more general rule. It reasoned that the removal of this exception allowed the FCC to bring treatment of fleeting indecent language into harmony with its overall enforcement policy. Fox, 129 S.Ct. at 1813. The existence of a similar safe harbor for fleeting images would have undermined this key holding of Fox. The Court’s omission of any discussion of fleeting images strongly suggests that, rather than constituting a per se exception, such instances fell within the contextual approach that the Court identified as the “Commission’s prior enforcement practice.” Fox, 129 S.Ct. at 1814. It follows that the FCC’s decision to apply a contextual analysis to the fleeting image in this case did not represent a change in policy.
The Court’s holding expressly relied on the distinctions it identified in the FCC’s historic treatment of different types of fleeting content. In concluding the agency’s reasons for eliminating a safe harbor for fleeting “nonliteral expletives” were “entirely rational,” the Court explained that “[i]t was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent.” Id. at 1812. The very fact that the safe harbor for fleeting expletives was an isolated exception to the FCC’s general contextual standard was itself, the Court said, a defensible reason for the policy change announced in Golden Globes and Fox: “The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was per se nonactionable because that was at odds with the Commission’s overall enforcement policy.” Id. at 1813 (internal quotation marks omitted).
As this examination of Fox makes clear, the Supreme Court’s account of the FCC’s pre-Golden Globes enforcement policy is not characterization, but central to Fox’s holding. Given that account, I would hold that the FCC’s indecency determination in this case did not constitute a change of policy — unacknowledged or otherwise— and was not arbitrary and capricious under the APA.[8]
*166 In our earlier opinion, we determined that if the policy change set forth in Golden Globes and Fox addressed only fleeting expletives, as the FCC has asserted, then it left in place a safe harbor for all other fleeting content. CBS, 535 F.3d at 181. Fox held precisely the opposite — -that in eliminating a safe harbor for fleeting expletives in Golden Globes and Fox, the FCC made a reasonable decision to abolish an anomalous exception and establish a uniform contextual test for all allegedly indecent material. The rationale of the FCC decision suggested by our earlier opinion — to eliminate a safe harbor for presumptively less offensive fleeting expletives while maintaining a per se exemption for fleeting literal utterances and potentially graphic images — would appear more dubious. In short, our earlier opinion is irreconcilable with the reasoning by which the Supreme Court upheld the FCC orders in Fox.
CBS argues that even if the indecency determination here did not constitute a change of policy, the forfeiture penalty must be invalidated because CBS was not sufficiently “on notice” of its potential liability for fleeting images. “Because due process requires that parties receive fair notice before being deprived of property ... in the absence of notice — for example, where the regulation is not sufficiently clear to warn a party about what is expected of it — an agency may not deprive a party of property by imposing civil or criminal liability.” Trinity Broad. of Fla., Inc. v. FCC, 211 F.3d 618, 628 (D.C.Cir.2000) (internal quotation marks and alterations omitted). Referring to the 1987 FCC decision quoted by Fox, CBS submits that “no fíne [in this case] can be justified based on a cryptic reference in dictum that was never discussed or applied for over two decades.” CBS Letter-Brief at 18.
CBS’s argument implicitly assumes that the 1987 decision was the only indication by the FCC that fleeting images were potentially actionable. But that is not the case. At the very least, the FCC’s opinion in Young Broadcasting, which involved somewhat similar facts and was issued only days before the Halftime Show, made clear that fleeting images of nudity could be found indecent if presented in a sufficiently explicit and pandering fashion. In issuing its Notice of Apparent Liability in that case, the FCC explained that “although the actual exposure of the performer’s penis was fleeting in that it occurred for less than a second,” this mitigating factor was outweighed by the explicitness and pandering quality of the image’s presentation. Young Broad., 19 FCC Red. at *167 1754-55, ¶¶ 10-12; see also id. (“In particular cases, one or two of the factors may outweigh the others, either rendering the broadcast material patently offensive and consequently indecent, or, alternatively, removing the broadcast material from the realm of indecency.” (footnotes omitted)).[9]
In our earlier opinion, we acknowledged that Young Broadcasting found a nude image indecent despite its fleetingness, but we declined to give effect to the FCC’s decision because we believed it amounted to an unacknowledged change in policy in contravention of the APA. See CBS, 535 F.3d at 187 (describing Young Broadcasting as “the Commission’s initial effort to abandon its restrained enforcement policy on fleeting material”). We held, in other words, that Young Broadcasting could not have validly changed the FCC’s policy with regard to fleeting material and could not therefore have relieved the FCC of the obligation to acknowledge and explain its new policy. As noted, however, I would revisit and revise our APA conclusion on the basis of Fox and no longer find that FCC policy historically immunized fleeting material from regulation.[10] The finding of indecency for the fleeting imagery in Young Broadcasting put CBS on notice that FCC policy did not afford fleeting images an automatic exemption from indecency regulation.
My colleagues offer an alternate interpretation of Young Broadcasting as an application of “an exception within the [per se ] exception.”[11] Majority op. at 133. They also believe that Young Broadcasting could not provide CBS with notice because it was a non-final notice of apparent liability. Id. at 130. Both interpretations are inapposite. The most straightforward reading of Young Broadcasting reveals the FCC applying a contextual standard rather than a set of nested exceptions, weighing all three factors with no one being determinative.[12] Moreover, de *168 spite my colleagues’ emphasis on notice, this standard was not a new departure for the FCC. Young Broadcasting’s use of a contextual standard is consistent with the FCC’s 2001 Industry Guidance and the Court’s account of FCC enforcement in Fox. The case’s unexceptional application of an established legal standard was sufficient to alert CBS to the possibility that fleeting images might be deemed indecent.
Following Fox, I cannot say that the FCC changed its policy by applying its contextual, three-factor standard to a fleeting image. Therefore I cannot join the majority’s holding that the forfeiture orders were arbitrary and capricious under the APA. Under Young Broadcasting, it was apparent before the Halftime Show that fleeting images could, depending on the context, be deemed indecent. For this reason, CBS was adequately on notice of the policy the FCC applied in this case.
III.
Whether Jackson and Timberlake’s performance was indecent is a distinct question from whether CBS can be held liable for the live broadcast of that performance. Because I would uphold the FCC’s orders under the APA, the latter question, which we examined in our prior ruling, has heightened importance.
A.
CBS challenges the ability of Congress or the FCC to regulate any indecency on broadcast television within the bounds of the First Amendment. It contends technological change has undercut the traditional rationale for providing lesser protection to broadcasting in relation to other modes of speech. In Pacifica, the plurality noted the scarcity of available frequencies and the need for licensing has always subjected broadcasters’ speech to greater regulation — including restrictions on speech that is indecent but not obscene. See Pacifica, 438 U.S. at 748, 98 S.Ct. 3026 (“[I]t is broadcasting that has received the most limited First Amendment protection. Thus, although other speakers cannot be licensed except under laws that carefully define and narrow official discretion, a broadcaster may be deprived of [its] license and [its] forum if the Commission decides that such an action would serve ‘the public interest, convenience, and necessity.’ ”). Pacifica noted that broadcast television is uniquely pervasive in American life and uniquely accessible to children. Id. at 748-50, 98 S.Ct. 3026. Given the array of media currently available, CBS argues broadcast television no longer inhabits the unique and ubiquitous role in American society that the Court found made it deserving of lesser First Amendment protection. Notwithstanding this criticism, the Supreme Court has given no hint it views subsequent technological changes as undermining Pacifica’s rationale that the unique characteristics of this medium allows Congress to regulate indecent speech on broadcast television.
B.
After oral argument on remand, we requested supplemental briefing on the proper standard of scienter. The FCC no longer presses theories of vicarious liability and non-delegable duty we rejected in our prior decision. Nor does it appear to contest our prior judgment that CBS can be held liable only if it acted recklessly in *169 broadcasting the offending image. Accordingly, the FCC requests a remand so that it may determine whether CBS acted with the required mens rea. CBS disputes the FCC’s characterization of the scienter threshold and contends there is no factual basis for a forfeiture penalty.
Congress has authorized the FCC to impose monetary forfeitures in several circumstances. See 47 U.S.C. § 503(b)(1). Two provisions are relevant here. Section 503(b)(1)(B) permits a penalty for “willfully or repeatedly failing] to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter,” and § 503(b)(1)(D) authorizes a forfeiture for “violat[ing] any provision of section ... 1464 ... of Title 18.” 47 U.S.C. § 503(b)(1)(B), (D). Although the FCC referenced § 503(b)(1)(D), its forfeiture orders in this case appear to rest solely on the authority of § 503(b)(1)(B). See, e.g., Forfeiture Order, 21 FCC Red. at 2776, ¶ 29 n.103 (explaining that because the FCC had found CBS liable under § 503(b)(1)(B), there was no need to “address whether [CBS] could also be held responsible under Section 503(b)(1)(D)”).
Our previous opinion expressed skepticism about the applicability of § 503(b)(1)(B) to indecency violations. CBS, 535 F.3d at 203-04. I would hold Congress intended the FCC to proceed under § 503(b)(1)(D) when sanctioning indecency violations. “Ordinarily, where a specific provision conflicts with a general one, the specific governs.” Edmond v. United States, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). Here, § 503(b)(1)(B) speaks generally of violations of “any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter.” Section 503(b)(1)(D), on the other hand, refers specifically to having “violated any provision of section ... 1464 ... of Title 18.”
The history of the forfeiture statute supports the view that Congress intended § 503(b)(1)(D) as the vehicle to impose forfeitures for airing indecent material. Both forfeiture provisions were originally enacted as part of the same set of amendments to the Communications Act. See Communications Act Amendments, 1960, Pub.L. No. 86-752, § 7, 74 Stat. 889, 894. At the time of enactment, § 503(b)(1)(B) could not have applied to indecency violations because 18 U.S.C. § 1464 was the only provision of federal law proscribing indecency; none of the “provisions of th[e] chapter” containing § 503(b)(1)(B), nor “any rule, regulation, or order issued by the Commission under th[at] chapter” addressed the subject of indecency. The FCC has argued that 47 C.F.R. § 73.3999, which was not promulgated until 1988, brought the indecency standard within the scope of § 503(b)(1)(B). But § 73.3999, which is entitled “Enforcement of 18 U.S.C. § 1464,” merely establishes the hours of the day when 18 U.S.C. § 1464 will be enforced. Given the statutory history, I believe Congress intended violations of 18 U.S.C. § 1464 to be enforced under 47 U.S.C. § 503(b)(1)(D) and not § 503(b)(1)(B). And since 47 C.F.R. § 73.3999 merely enforces 18 U.S.C. § 1464’s substantive standard, it did not serve to bring indecency violations under the authority of § 503(b)(1)(B).
Even if § 503(b)(1)(B) were applicable to indecency actions, I am skeptical that it would authorize a forfeiture in this case. The provision requires a showing that a licensee “willfully or repeatedly” violated a statutory or regulatory standard. According to the statutory definition, “the term ‘willful,’ when used with reference to the commission or omission of any act, means the conscious and deliberate commission or *170 omission of such act.” 47 U.S.C. § 312(f). The FCC does not contend that CBS knew that Timberlake would expose Jackson’s breast, or intended that display to occur. Instead, the FCC believes CBS’s actions were “willful” insofar as the network “consciously and deliberately” failed to take precautions despite the alleged existence of a known or obvious risk that indecent material would be broadcast. But since the act that must be “willful” is, in this context, the violation of 18 U.S.C. § 1464, it would appear that CBS cannot be held liable unless it “consciously and deliberately” broadcast the specific material deemed indecent. The FCC argues the act can be either a commission or omission — here (in the view of the FCC) the failure to take necessary precautions. But even if an omission can support a finding of a violation of § 503(b)(1)(B), the omission still must be “willful.” The reckless omission of “precautions” would seem insufficient to satisfy the willfulness requirement of § 503(b)(1)(B).
Although I would find the FCC’s orders relied on inapposite statutory authority, I do not believe this error precludes the FCC from applying § 503(b)(1)(D) on remand. See WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C.Cir.2002) (remanding rulemaking where the FCC had relied on an inapposite statutory provision “[b]e-cause there may well be other legal bases for adopting the rules chosen by the Commission”); see also Castaneda-Castillo v. Gonzales, 488 F.3d 17, 25 (1st Cir.2007) (“If the agency decision is flawed by mistaken legal premises, ... remanding to give the agency an opportunity to cure the error is the ordinary course.” (emphasis omitted)); cf. SEC v. Chenery Corp., 332 U.S. 194, 200-01, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (“The fact that the [agency] had committed a legal error in its first disposition of the case certainly gave [the prejudiced party] no vested right to receive the benefits of such an order.”).
The Supreme Court has directed as a general matter:
If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.
Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). There have been few instances where courts have found “rare circumstances.” One such circumstance is “when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision-makers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency’s choice.” Sierra Club v. Peterson, 185 F.3d 349, 369 (5th Cir.1999) (quoting Nat’l Audubon Soc’y v. Hoffman, 132 F.3d 7, 14 (2d Cir.1997)). Of course, remand is not required where a proper application of the correct standard could yield only one possible result. See George Hyman Constr. Co. v. Brooks, 963 F.2d 1532, 1539 (D.C.Cir.1992) (“[W]e find that a remand would be futile on certain matters as only one disposition is possible as a matter of law.”). But where “the answer the [agency] might give were it to bring to bear on the facts the proper administrative and statutory considerations” is “[s]till unsettled,” remand is the proper course. Chenery, 332 U.S. at 200, 67 S.Ct. 1575. As I believe, following Fox, the FCC did not act in an arbitrary and capricious manner, whether CBS can be held liable for its broadcast of the Halftime *171 Show is still unsettled.[13] That is the case here; the “function” of applying the proper liability standard to the facts of this case “belongs exclusively to the Commission in the first instance.” Id.
C.
1.
Section 503(b)(1)(D), unlike § 503(b)(1)(B), does not contain an express scienter requirement. On remand, both parties agree that scienter is a prerequisite of liability under § 503(b)(1)(D) and 18 U.S.C. § 1464, but they dispute what mental state is required. The FCC contends that recklessness suffices, while CBS insists it can be liable only if it had knowledge the Halftime Show would contain indecent material and it intended to violate the indecency standard.
In most criminal or civil actions for obscenity or indecency, the element of scienter as to the broadcast’s content will not be in doubt as “the defendant will necessarily know the contents of his utterances.” United States v. Smith, 467 F.2d 1126, 1129 (7th Cir.1972). Scienter will be an issue in forfeitures under § 1464, where, as here, live, unscripted events are broadcast. The broadcaster may not have forewarning of a potentially-indecent unscripted or spontaneous event. Nor might the conduct of a third-party or independent contractor necessarily be imputed to the broadcaster. Live broadcasts, as opposed to scripted or “taped” programming, will always carry the possibility or risk of transmitting indecent material.
Against this backdrop, I believe recklessness is the constitutional minimum standard for scienter when imposing forfeiture penalties. “The presumption in favor of scienter requires a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct.” Carter v. United States, 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (internal quotation marks omitted). Recklessness provides sufficient protection under the First Amendment to speech in similar contexts. See New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (allowing the imposition of liábility upon a showing that the defendant published a statement with “reckless disregard” of the risk it was false); see also CBS, 535 F.3d at 206-07 (citing Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990)) (“Also instructive here are other cases determining recklessness to be an adequate level of scienter for imposing liability in related First Amendment contexts where speech or expression is restricted based on its content.”).[14]
Imposing a higher scienter standard than recklessness, such as the actual knowledge or intent standard urged by CBS, dilutes the duty imposed by Congress in 18 U.S.C. § 1464 and risks creating an end-around indecency restrictions.[15] *172 Such a standard could permit “willful blindness” or allow broadcasters to fail to take reasonably available precautions (such as implementing delay technologies) despite any obvious risks, and then evade responsibility if indecent material is broadcast, claiming they neither intended nor were aware that the indecent material would be broadcast. End runs might also be effected through the use of independent contractors. Accordingly, I do not believe liability for indecent broadcasts requires a showing of actual knowledge, actual awareness, or intent on the part of the broadcaster.[16]
2.
The question remains what is the proper standard of recklessness under § 1464. As an alternative argument, CBS contends there is more than one possible definition of recklessness, and the more demanding criminal standard ought to apply here. As the Supreme Court has explained:
[t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware.
Farmer v. Brennan, 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal citations omitted); see also Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 68 n. 18, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) (“Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender.”).
*173 In my view, the FCC may on remand seek a civil forfeiture under 47 U.S.C. § 503(b)(1)(D), but CBS’s alleged liability is predicated on its violation of 18 U.S.C. § 1464, a criminal statute. For this reason, CBS contends the level of scienter cannot vary based on whether the FCC pursues civil remedies or the Department of Justice charges criminal offenses. Notwithstanding the civil character of the forfeiture action, CBS contends it can be held liable for a forfeiture penalty only if it were criminally reckless — if it disregarded an unjustifiably high risk of broadcast indecency of which it was aware. Farmer, 511 U.S. at 836-37, 114 S.Ct. 1970. The FCC counters that in Pacifica the Supreme Court already interpreted the standard for civil forfeitures for indecency violations independent from § 1464’s criminal applications, making clear the civil recklessness standard applies.
I believe a civil standard best comports with Congressional intent. In 1960, Congress expanded the civil forfeiture provisions of the Federal Communications Act to allow the FCC greater flexibility to regulate the broadcast medium. Before the 1960 Act, the FCC’s regulatory tools were limited to revoking the broadcaster’s license or asking the Department of Justice to commence criminal proceedings.[17] Communication Act Amendments, 1960, H.R.Rep. No. 86-1800, at 17, 1960 U.S.C.C.A.N. 3516, 3532. The FCC asked Congress to “provide it with an effective tool in dealing with violations where revocation or suspension does not appear to be appropriate.” Id. The House Report explaining the amendments indicated that to achieve the desired flexibility the civil forfeiture provisions should be read as independent from other enforcement provisions. The Report states “the FCC will not be precluded from ordering a forfeiture merely because another type of sanction or penalty has been or may be applied to the licensee or permittee.” Id.
The most telling argument in favor of a civil standard is the Supreme Court’s opinion in Pacifica. As noted by the FCC, the plurality in Pacifica recognized that Congress intended the civil provisions of the Communications Act to be interpreted and applied apart from the criminal provisions. The plurality stated in footnote 13:
The statutes authorizing civil penalties incorporate § 1464, a criminal statute. See 47 U.S.C. §§ 312(a)(6), 312(b)(2), and 503(b)(1)(E) (1970 ed. and Supp. V). But the validity of the civil sanctions is not linked to the validity of the criminal penalty. The legislative history of the provisions establishes their independence. As enacted in 1927 and 1934, the prohibition on indecent speech was separate from the provisions imposing civil and criminal penalties for violating the prohibition. Radio Act of 1927, §§ 14, 29, and 33, 44 Stat. 1168 and 1173; Communications Act of 1934, §§ 312, 326, and 501, 48 Stat. 1086, 1091, and 1100, 47 U.S.C. §§ 312, 326, and 501 (1970 ed. and Supp. V). The 1927 and 1934 Acts indicated in the strongest possible language that any invalid provision was separable from the rest of the Act. Radio Act of 1927, § 38, 44 Stat. 1174; Communications Act of 1934, § 608, 48 Stat. 1105, 47 U.S.C. § 608. Although the 1948 codification of the criminal laws and the addition of new civil penalties changed the statutory structure, no substantive change was apparently intended. Cf. Tidewater Oil Co. v. United States, 409 U.S. 151, 162, 93 S.Ct. 408, *174 34 L.Ed.2d 375 [ (1972) ]. Accordingly, we need not consider any question relating to the possible application of § 1464 as a criminal statute.
Pacifica, 438 U.S. at 739 n. 13, 98 S.Ct. 3026. Under Pacifica, the level of scienter to prove a violation of § 1464 need not be the same for both criminal and civil applications. Of course, the respective penalties are different. Violation of 18 U.S.C. § 1464 carries a statutory maximum penalty of up to two years imprisonment and a fine of up to $250,000 for individuals and $500,000 for organizations. 18 U.S.C. §§ 1464, 3571(b)-(c). At the time of the alleged violation,[18] a forfeiture under 47 U.S.C. § 503(b)(1) carried a maximum forfeiture of § 27,500 for each station. Reconsideration Order, 21 FCC Red. at 6654, ¶2. As the FCC found twenty stations aired the indecent material in the Halftime Show, it imposed a forfeiture on CBS of $550,000 (twenty violations at the maximum $27,500 per violation). Id.
CBS relies on FCC v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954). In ABC, the FCC desired to ban “give away” contests where radio and television stations would distribute prizes to listeners and viewers who called in and correctly answered a question or solved a puzzle. 347 U.S. at 286-87, 74 S.Ct. 593. To this end, the FCC promulgated regulations interpreting 18 U.S.C. § 1304, which prohibits broadcasting “any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance.” Id. at 285, 74 S.Ct. 593. The FCC defined games of chance to include “give away” contests. Id. at 286, 74 S.Ct. 593. Prior to adopting the regulation, the FCC had failed to persuade the Department of Justice to pursue criminal actions against such programs and had urged Congress unsuccessfully to amend the law. Id. at 296, 74 S.Ct. 593. Additionally, the Post Office, which administered a similar statute involving the mails, and the Department of Justice had interpreted the same statutory language to exclude the type of program the FCC wished to regulate. Id. at 294, 74 S.Ct. 593. The Court concluded “[tjhere cannot be one construction for the Federal Communications Commission and another for the Department of Justice.” Id. at 296, 74 S.Ct. 593; see also Leocal v. Ashcroft, 543 U.S. 1, 11-12 n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); United States v. Thompson/Center Arms Co., 504 U.S. 505, 506-07, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality).[19] CBS contends we must construe § 1464 in the exact same *175 manner as if this were a criminal prosecution.[20]
There is some merit in CBS’s position that, as a general matter, a statute should be read consistently in its criminal and civil applications. But in ABC (and also Leocal and Thompson), the Court construed the literal text of a statute, finding no good reason to apply different constructions for civil actions and criminal prosecutions. In this case, there is no text to interpret. The statutes (18 U.S.C. § 1464 and 47 U.S.C. § 503(b)(1)(D)) are silent on scienter; as a consequence, we must apply the constitutionally required level of scienter. Furthermore, “[i]f [Congress’s] intent is made plain, it is unnecessary for us to refer to other canons of statutory construction, and indeed we should not do so.” In re Am. Home Mortg. Holdings, Inc., 637 F.3d 246, 254-55 (3d Cir.2011). As I have noted, the Supreme Court in Pacifica concluded Congress intended the specific provision at issue to be interpreted for civil forfeitures without regard to its application in criminal prosecutions. Pacifica, 438 U.S. at 739 n. 13, 98 S.Ct. 3026. Accordingly, I would read into the statute only the scienter necessary in this context for a civil forfeiture order — the objective standard of civil recklessness.
3.
If we were to reject, as I think we should, CBS’s arguments under the APA, at issue would be whether the standard of recklessness for a civil forfeiture under § 503(b)(1)(D) is subjective (knowledge or awareness of an unjustifiably high risk of harm) or objective (should have been aware of such a risk). I believe an objective standard for recklessness is sufficient to separate wrongful from otherwise innocent conduct.[21] Adoption of a subjective standard, namely that for live television broadcasts the broadcaster must know or be aware indecency will occur, risks encouraging deliberate ignorance or failure to use available preventive measures such as delay technology.
In addition to comporting with Congress’s intent in creating the civil forfeiture provision of § 503(b)(1)(D), a civil recklessness standard provides protection commensurate with indecency’s constitutional status. The First Amendment requires we apply “only that mens rea which is necessary to separate wrongful conduct *176 from ‘otherwise innocent conduct.’ ” Carter v. United States, 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (quoting X-Citement Video, 513 U.S. at 72, 115 S.Ct. 464). The issue presents a difficult question of constitutional law, as the plurality in Pacifica noted when it stated, “the constitutional protection accorded to a communication containing such patently offensive sexual and excretory language need not be the same in every context” and noted the Court “tailored its protection” of speech “to both the abuses and the uses to which it might be put.” Pacifica, 438 U.S. at 747 & n. 24, 98 S.Ct. 3026. At a minimum, the FCC must show CBS had a sufficient level of culpability to justify a civil forfeiture. Because displays of indecent material “surely lie at the periphery of the First Amendment concern” an objective standard is appropriate. Fox, 129 S.Ct. at 1819 (quoting Pacifica, 438 U.S. at 743, 98 S.Ct. 3026). Furthermore, an objective standard is not without precedent.[22]
It is not sufficient to show that CBS should have acted differently or was merely negligent. Inadvertence or common negligence will not suffice. CBS contends there is no evidence to support a finding that it acted recklessly. But this is a question of proof committed to the FCC in the first instance. CBS and the FCC continue to contest critical issues. One consideration is the availability of delay technology. CBS and the FCC dispute whether video delay technology could have been implemented at the time of the incident. They also dispute whether CBS should have anticipated that indecent material could be broadcast' — e.g., whether Jackson’s choreographer’s “shocking moments” prediction should have put CBS on notice. Since the FCC appears to have based its forfeiture orders on an erroneous — or, at the least, unclear — standard of liability, after rejecting CBS’s APA arguments, I would remand to allow the agency to measure CBS’s conduct against the proper mens rea standard.
IV.
In addition to the arguments addressed, CBS contests the FCC’s forfeiture orders on the ground that the agency’s multifactor, contextual indecency standard is unconstitutionally vague. In its most recent decision in Fox, the United States Court of Appeals for the Second Circuit endorsed this view, see Fox Television Stations, Inc. v. FCC, 613 F.3d 317 (2d Cir.2010), and CBS encourages us to follow suit. In Fox, however, the constitutional question was the primary, if not exclusive, *177 issue left in the case after the Supreme Court’s remand. Here, it may be possible to dispose of the action without resolving the constitutional question.
“A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.” Lyng v. Nw. Indian Cemetery Protective Assn., 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Therefore, I would not address the constitutional issue.
V.
For the foregoing reasons, I would grant the petition for review, vacate the FCC’s forfeiture orders, and remand for consideration of the forfeiture order under the proper standard.

. My colleagues incorporate portions of our ' earlier decision in Part B of their opinion. Since I believe Fox requires a different result, I would omit our prior opinion.

. CBS and others have questioned whether broadcasting continues to be a unique medium. The Court, however, has so far declined to abandon the scarcity doctrine without the support of Congress or the FCC. See League of Women Voters, 468 U.S. at 376 n. 11, 104 S.Ct. 3106 ("The prevailing rationale for broadcast regulation based on spectrum scarcity has come under increasing criticism____ We are not prepared, however, to reconsider our longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required.”); see also Petition for Writ of Certiorari at 2-8, FCC v. Fox Television Stations, Inc., 131 S.Ct. 3065 (2011) (No. 10-1293), 2011 WL 1540430 at *2-8 (providing the Solicitor General’s view on the development of indecency policy and the unique position of broadcast television).

. “Congress authorized the FCC to impose forfeiture penalties for violations of 18 U.S.C. § 1464 in 1960.” CBS, 535 F.3d at 175; see Communications Act Amendments, 1960, Pub.L. No. 86-752, § 7, 74 Stat. 889, 894 (codified as amended at 47 U.S.C. § 503(b)(1)).

. The four programs were: "(1) Fox's broadcast of the 2002 Billboard Music Awards, in which performer Cher used an unscripted expletive during her acceptance speech; (2) Fox’s broadcast of the 2003 Billboard Music Awards, in which presenter Nicole Richie used two unscripted expletives; (3) ABC's broadcast of various episodes of its NYPD Blue series, in which assorted characters used scripted expletives; and (4) a CBS broadcast of The Early Show, in which a guest used an unscripted expletive during a live interview.” CBS, 535 F.3d at 178 (citing Various Television Broads., 21 FCC Red. at ¶¶ 101, 112 n. 64, 125, 137).

. See In re Complaints Regarding Various Television Broads. Between Feb. 2, 2002 and Mar. 8, 2005, 21 FCC Red. 13299 (2006). The revised order reversed the finding that The Early Show broadcast was indecent and dismissed the complaint against ABC on procedural grounds. Id. at 13299, ¶ 1. The order reviewed by the Second Circuit (and subsequently by the Supreme Court) thus contained indecency determinations only as to the two Billboard Music Awards broadcasts.

. The first incident occurred during the 2002 Awards, "when the singer Cher exclaimed, 'I’ve also had critics for the last 40 years saying that I was on my way out every year. Right. So f* * * 'em.’ ” Fox, 129 S.Ct. at 1808. The second took place during the 2003 Awards, when Nicole Richie "proceeded to ask the audience, 'Why do they even call it "The Simple Life”? Have you ever tried to get cow s* * * out of a Prada purse? It's not so P * *ing simple.' ” Id.

. I acknowledge that the allegedly indecent material at issue in Fox involved only words, and that Fox's discussion of the FCC enforcement policy is not on its face addressed to the agency's treatment of images. But the Court's account of FCC enforcement policy and history limits the fleeting exemption solely to nonliteral use of "evocative language.” See id. at 1807. The Court noted that the FCC had rejected other types of exemptions. See id. at 1813 (“When confronting other requests for per se rules governing its enforcement of the indecency prohibition, the Commission has declined to create safe harbors for particular types of broadcasts.”). The structure of the Court's discussion conveys *165 that the Court viewed the exception for nonliteral expletive language as an exception at odds with the FCC’s treatment of all other material, including images.

. Our previous opinion identified several FCC decisions in which the FCC had found that certain fleeting images did not violate the indecency standard. See CBS, 535 F.3d at 184-86. We believed these decisions supported our conclusion that FCC policy had afforded a safe harbor to all fleeting material. In none of these cases, however, did the FCC *166 state that fleeting images were per se- nonactionable. In light of Fox, I believe that these decisions are also compatible with a contextual standard. Precisely because the reasoning in many of these opinions is sparse, they may be read as holding not that the fleeting quality of the images was per se dispositive but rather that, in the particular context presented, the image’s transience outweighed any countervailing factors.
CBS argues that even if fleeting material did not enjoy a per se exemption under FCC policy, the agency applied its contextual standard differently here that it had in earlier cases where fleetingness proved dispositive. "[Pjatently inconsistent applications of agency standards to similar situations are by definition arbitrary.” South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 103 (1st Cir.2002). But CBS has not shown that the facts in this case are materially indistinguishable from a case in which the agency found no indecency. As we have recognized, "an agency’s interpretation of its own precedent is entitled to deference.” CBS, 535 F.3d at 180 (quoting Cassell v. FCC, 154 F.3d 478, 483 (D.C.Cir.1998)). Given the nature of the FCC’s contextual standard, each case is likely to present a unique balance of factors, and I cannot say that the FCC acted unreasonably in determining that the fleetingness of the image here was outweighed by its graphic and pandering qualities.

.It is true, as we noted in our previous opinion, that Young Broadcasting "makes no distinction, express or implied, between words and images.” CBS, 535 F.3d at 186. The FCC’s opinion suggests that all fleeting content is subject to a contextual standard and fails to acknowledge even the limited safe harbor for fleeting expletives identified in Fox. See Young Broad., 19 FCC Red. at 1754-55, ¶¶ 10, 12 n. 35; see also Industry Guidance, 16 FCC Red. at 8003, ¶ 10 (stating, without any mention of a per se exemption for fleeting expletives, that under the FCC’s analytical framework, "[n]o single factor generally provides the basis for an indecency finding”). That Young Broadcasting overstated the historic scope of liability, however, does not preclude that case from furnishing adequate notice of broadcast licensees' potential liability for fleeting images; if anything, this error served to underscore the risk of liability. The FCC’s forfeiture order here reflected the FCC's understanding that all fleeting material would be subject to a contextual standard. See Forfeiture Order, 21 FCC Red. at 2766, ¶ 12 (concluding that "even though we find that the partial nudity [broadcast at the end of the Halftime Show] was fleeting, the brevity of the partial nudity is outweighed by the first and third factors of our contextual analysis”).

. I will not address CBS’s constitutional challenge to the indecency standard. See infra Section IV.

. It bears noting that the FCC in this case made the same finding as in Young Broadcasting that "the material was apparently intended to pander to, titillate and shock viewers.” Forfeiture Order, 21 FCC Red. at 2763, ¶ 3, 2766-67, ¶ 13. If there is indeed an "exception within the exception" for titillating and shocking content, it would appear to apply in this instance as well.

. My colleagues argue that the FCC recognized an exemption in Young Broadcasting because it cited prior FCC decisions concluding that the fleetingness of an image tended to weigh in favor of a finding of no liability. Majority op. at 133. But the FCC discussed fleetingness in Young Broadcasting in the context of the three-factor contextual standard. See Young Broad., 17 FCC Red. at 1755 ("In particular cases, one or two of the factors *168 may outweigh the others, either rendering the broadcast material patently offensive and consequently indecent, or, alternatively, removing the broadcast material from the realm of indecency. In this case, we examine all three factors.... ” (footnote omitted)). It did not state there was a per se exception for all fleeting images.

. Accordingly, I believe, as our prior opinion held, that even if the FCC’s forfeiture order were arbitrary and capricious, the FCC could on remand issue a finding of indecency without a civil forfeiture as it did in Golden Globes. CBS, 535 F.3d at 209.

. At common law, the concept of recklessness could be expressed in a variety of ways. Historically, terms such as malicious or wanton “were used interchangeably with recklessness.” David M. Treiman, Recklessness and the Model Penal Code, 9 Am. J.Crim. L. 281, 293 (1981).

.CBS also argues that the FCC must show it specifically intended to violate the indecency prohibition in § 1464. CBS relies on prePacifica case law addressing prosecutions for scripted broadcasts of obscene or indecent material. See United States v. Smith, 467 F.2d 1126 (7th Cir.1972); Tallman v. United *172 States, 465 F.2d 282 (7th Cir.1972); Gagliardo v. United States, 366 F.2d 720 (9th Cir.1966). These cases have limited value as they address criminal prosecutions for scripted content. See Pacifica, 438 U.S. at 747 n. 25, 98 S.Ct. 3026 (Stevens, J., plurality op.) (differentiating precedents addressing criminal prosecutions and the First Amendment by noting "[e]ven the strongest civil penalty at the Commission’s command does not include criminal prosecution”). Furthermore, Pacifica did not require the FCC show specific intent for the civil forfeiture at issue there nor did the Court cite to any of the cases on which CBS relies.
Even under the pr e-Pacifica cases, this "specific intent” requirement of § 1464 is satisfied if one should have known the utterance or broadcasting of such speech would violate the law. In Tallman v. United States, upon which CBS relies, the Seventh Circuit in interpreting § 1464 concluded that "specific intent” is present under the standard traditionally used at common law "if the defendant knew or reasonably should have known that uttering the words he did over the air was a public wrong.” 465 F.2d at 288; see also Smith, 467 F.2d at 1130 n. 2 (citing Tallman for the proposition "an appropriate instruction as to specific intent under this statute might be that ‘the defendant knew or reasonably should have known that uttering the words he did over the air was a public wrong’ ”). Even these pr e-Pacifica precedents addressing criminal prosecutions recite an "objective” or "reasonable person” standard for scienter.

. The cases cited by CBS in defense of its proposed mens rea standard are inapposite, because in each case Congress had already provided a scienter standard as to some elements of the statutory offense. See Flores-Figueroa v. United States, 556 U.S. 646, 129 S.Ct. 1886, 173 L.Ed.2d 853 (2009); United States v. X-Citement Video, Inc., 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In each of these cases, the statute in question contained some mental state language, such as “knowingly,” that when read naturally did not appear to modify all the elements in the statute, see 18 U.S.C. § 1028A(a)(l); 18 U.S.C. § 2252. The Court only addressed whether the express scienter term applied to every element of the statutory offense or whether the term modified a single element of the offense. These cases do not address what mental state requirement should be read into provisions like 47 U.S.C. § 503(b)(1)(D) and 18 U.S.C. § 1464 that contain no mens rea language whatsoever.

. Prior to 1960, § 503 only authorized forfeitures for accepting rebates or offsets that deviated from the tariff rates for the transmission of wire or radio messages. Federal Communications Act of 1934, Pub.L. No. 73-416, § 503, 48 Stat. 1064, 1101 (1934).

. In 2006, Congress added 47 U.S.C. § 503(b)(2)(C) which raised maximum penalties for those found "to have broadcast obscene, indecent, or profane language” to $325,000 per violation, not to exceed an aggregate of $3 million for any single act of failure to act. Broadcast Decency Enforcement Act of 2005, Pub.L. No. 109-235, 120 Stat. 491, 491 (2006).

. In Leocal v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), when interpreting the definition of "crime of violence” contained in 18 U.S.C. § 16 as applied to a civil deportation proceeding, the Court noted that if the definition were ambiguous it would apply the rule of lenity used in criminal proceedings because the statute "has both criminal and noncriminal applications.” Id. at 12 n. 8, 125 S.Ct. 377. Similarly, in United States v. Thompson/Center Arms Co., the Court had to define when a firearm was "made” to determine if a tax on the "making” was owed to the government. 504 U.S. 505, 506-07, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality). To resolve the issue, the Court applied the rule of lenity because "although it is a tax statute that we construe now in a civil setting, the [statute] has criminal applications.” Id. at 517, 112 S.Ct. 2102; see also id. at 523, 112 S.Ct. 2102 (Scalia, J., concurring in judgment).

. Justice Stewart’s dissent raised the argument CBS raises here that the statute must be read in keeping with ABC, Pacifica, 438 U.S. at 780 n. 8, 98 S.Ct. 3026 (Stewart, J., dissenting), a proposition the plurality rejected in footnote 13.

. In practice the distinction between a subjective or an objective standard may not always result in differences on liability. The law has traditionally allowed the use of objective evidence to prove a party’s subjective state of mind. See Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1090 (3d Cir.1988) ("[Ojbjective circumstantial evidence can suffice to demonstrate actual malice.”). The Supreme Court has noted:
We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind. See [Roscoe] Pound, The Role of the Will in Law, 68 Harv. L.Rev. 1 [1954]. Cf. American Communications Ass’n, C.I.O., v. Douds, 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 [1950], Eyewitness testimony of a bookseller’s perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.
Smith v. California, 361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); see also Colorado v. Hall, 999 P.2d 207, 220 (Colo.2000) ("In addition to the actor’s knowledge and experience, a court may infer the actor's subjective awareness of a risk from what a reasonable person would have understood under the circumstances.”).

. In other areas such as use of "fighting words” — words inherently likely to provoke a violent reaction — the Court has looked at what reaction a reasonable speaker would expect from the utterance of her speech. See Chaplinsky v. New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Recent Supreme Court cases have reaffirmed that some categories of speech are entitled to lesser or even no constitutional protection. There are traditional, though limited, categories where the First Amendment has not protected those who would “disregard these traditional limitations.” United States v. Stevens, — U.S. —, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (internal quotation omitted). These categories (including obscenity) "are 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.’ " Id. (quoting Chaplinsky, 315 U.S. at 571-72, 62 S.Ct. 766).
Unlike obscenity, indecency enjoys some constitutional protection, but of a lesser kind. See Pacifica, 438 U.S. at 748, 98 S.Ct. 3026 (“Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual’s right to be left alone plainly outweighs the First Amendment rights of an intruder.”). An objective standard comports with this peripheral status.